A94A0610. LUMBERMENS MUTUAL CASUALTY COMPANY v. PLANTATION PIPELINE COMPANY.
(447 SE2d 89)

SMITH, Judge.

In this dispute regarding coverage under an excess liability insurance policy, Lumbermens Mutual Casualty Company (LMC) appeals from the grant of partial summary judgment to Plantation Pipeline Company (PPL) and the denial of its own motion for summary judgment.

PPL is a bulk petroleum transmission company that operates across the southeastern United States. It purchased from American Re-Insurance Company general liability policies with limits of $900,000 in excess of $100,000 for which PPL was self-insured, providing coverage for events occurring between November 30, 1973 and November 30, 1976. From November 30, 1974 through November 30, 1975, PPL also held a certificate of excess insurance issued by California Union Insurance Company, which provided coverage for claims exceeding the $1,000,000 ceiling of the American policy up to a maximum of $3,000,000. In addition, from November 30, 1972 through November 30, 1975, PPL held a comprehensive catastrophe liability policy of excess insurance issued by LMC, which provided a third layer of coverage up to $5,000,000, for claims in excess of the ceiling on the California Union excess insurance policy.

PPL has an easement to maintain its pipelines at a certain site in Mecklenburg County, North Carolina. In March 1975, a leak was discovered in a 14-inch underground pipeline at the Mecklenburg County site. PPL repaired the pipeline immediately and began efforts to recover the spilled petroleum. From that time through June 1983, approximately 2,022 barrels of spilled petroleum products were recov-

ered from standpipes at the leak site. During the period between January and June 1983, only eight-and-one-half barrels were recovered. During the next 15 months — through September 1984 — PPL recovered no measurable quantity of petroleum product, and on October 1, 1984, recovery was discontinued. PPL expended approximately $18,663 on repairing the leak and on the entire recovery operation from 1975 to 1984. It also paid $3,000 to the property owner, Michael Finch, in consideration for the execution of a release and indemnification agreement. It is undisputed that although PPL notified the North Carolina Division of Environmental Management of the leak in 1975, it did not at that time notify its insurers.

In June 1989, Finch sold the property to a North Carolina partnership, which thereafter contracted to sell the property to Mecklenburg County. In conjunction with its contract to purchase the property, the county conducted an environmental assessment and installed groundwater monitoring wells. Through this monitoring activity, the county detected petroleum products in the groundwater. It then advised the partnership it was considering cancelling the purchase. The purchase was not completed. In a notice of violation dated July 25, 1990, the North Carolina Department of Environmental Health and Natural Resources (DEHNR) directed PPL to carry out a remedial action plan. Within a few days, on August 2, 1990, PPL notified all its insurance carriers in writing that it faced possible responsibility for remedial action under North Carolina pollution control laws, as well as possible liability to third parties. PPL requested that the insurers defend and indemnify it for this potential liability. The partnership subsequently filed suit against PPL in federal court seeking to recover damages stemming from the loss of the sale of the property. When the insurers denied coverage, PPL filed this declaratory judgment action.

LMC moved for summary judgment on two grounds: that the claim was not timely filed, breaching a policy condition requiring timely notice of a claim; and that coverage was excluded because of policy "pollution" exclusions. PPL filed a cross-motion for summary judgment, claiming the exclusions were not applicable and that it was entitled to coverage for this claim under the policy. The trial court ruled against LMC and in favor of PPL on both grounds. LMC raises the same contentions on appeal.[1]

1. LMC contends the trial court erred in finding that PPL's claim was timely filed. The policy provides that "[w]henever it appears that an occurrence is likely to involve indemnity under this policy, written

---

[1] California Union filed a similar motion with the same result. A companion appeal by California Union has been withdrawn.

notice thereof shall be given to the company or any of its authorized agents as soon as practicable." LMC contends PPL knew or should have known in 1975 cf the seriousness of the 1975 leak and the likelihood that it would "involve indemnity under this policy." It asserts that the number of barrels of petroleum product eventually recovered by PPL and the fact that PPL entered into a release and indemnification agreement with Finch support this contention. It argues, therefore, that PPL had an obligation to notify its insurers as soon as the leak was discovered, but certainly not as late as 1990, and that PPL's failure to do so is a breach of this policy condition, precluding coverage.

LMC correctly notes that PPL alone possessed the ability to investigate and evaluate the value of the claim from 1975 through 1990. It also points out that cleanup costs at the site may range as high as over $4,000,000. Nevertheless, we do not agree that PPL's evaluation of the claim as not requiring notice to LMC was unreasonable. Cases such as *Protective Ins. Co. v. Johnson*, 256 Ga. 713, 714 (1) (352 SE2d 760) (1987) and *Townsend v. Nat. Union Fire Ins. Co.*, 196 Ga. App. 789 (397 SE2d 61) (1990), cited by LMC in support of its argument, are not apposite. Such cases, where delay in notifying the insurer was held to be unreasonable, all involve personal injury protection under no-fault automobile policies that required notice to the insurer as soon as practicable after an *event*. None involves an excess policy, where, as here, the notice obligation is triggered by the insured's assessment of the likelihood of the monetary amount of the property damage for which it may be liable exceeding the "ceiling" of the primary policy.

The number of barrels of petroleum product that would eventually be recovered from the leak site and the cost of the eventual cleanup were certainly not known in 1975. However, since the LMC policy was an excess insurance policy, its coverage would not be reached until the limits of both the American Re-Insurance and the California Union policies were exhausted, i.e., when liability exceeded $3,000,000. In nine years of recovery operations, PPL expended only $18,663 on cleanup and $3,000 to obtain the release from Finch. PPL's total expenditure by 1984 was therefore approximately 0.7 percent of LMC's floor of coverage. Moreover, at no time between 1984 and 1990 did any government agency make demand upon PPL to conduct any further remediation. The word "likely" means "probable," not merely possible. We do not agree with LMC that these facts "indicate" that PPL was "clearly aware" that coverage under the LMC policy would be involved.

Given these facts, and considering that LMC has pointed to no other facts showing that PPL should have known that its liability would exceed $3,000,000 and that the limits of the California Union

policy would even be reached, much less exceeded, no basis existed for finding that the LMC policy would become "involved." The trial court properly granted summary judgment to PPL and denied summary judgment to LMC on this issue.

2. LMC also maintains the trial court erred in ruling that, as a matter of law, the policy exclusions did not bar coverage for the claim. The policy contains two pertinent exclusions: a general contamination or pollution exclusion, and a supplementary exclusion. The general contamination or pollution exclusion bars coverage for personal injury or property damage "arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any watercourse or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental." In *Claussen v. Aetna Cas. &c. Co.*, 259 Ga. 333 (380 SE2d 686) (1989), the Supreme Court held that "sudden and accidental" means unexpected and unintended. Because it is undisputed that PPL did not expect or intend the leak, the release was "sudden and accidental" within the meaning of the general exclusion, and that exclusion does not apply.

The supplementary exclusion precludes coverage with regard to operations described in the endorsement for "a discharge, dispersal, release or escape of oil or other petroleum substance or derivative . . . into or upon any watercourse or body of water" regardless of whether it is "sudden and accidental." LMC maintains this exclusion bars coverage for PPL's claim. The dispute centers on the meaning of the phrase "any watercourse or body of water," an issue that appears to be one of first impression in Georgia. LMC contends the trial court erred in finding that the contaminated groundwater at the North Carolina site is not contemplated by this phrase, because groundwater *is* a body of water. In support of this contention, LMC points to several cases from other jurisdictions. However, a review of the cases cited by LMC reveals that these cases involved varying facts and do not constitute persuasive authority for a blanket holding that the term "body of water" necessarily includes *all* groundwater.

*Morton Intl. v. Harbor Ins. Co.*, 607 NE2d 28 (Ohio App. 1992), cited by LMC, where a similar exclusion was held to apply, clearly involved pollution of both groundwater *and surface water*, which includes bodies of water. Id. at 34. In *Mapco Alaska Petroleum v. Central Nat. Ins. Co.*, 784 FSupp. 1454 (D. Alaska 1991), cited by LMC, a trial court decision involving the contamination of groundwater by an oil refinery, the court gave no rationale for its decision but simply relied upon the decision in *Time Oil Co. v. Cigna Property &c. Ins. Co.*, 743 FSupp. 1400 (W.D. Wash. 1990), in which a petroleum exclusion was held to bar coverage under a policy issued to an oil recycler.

Both the language of the petroleum exclusion and the contaminated water in *Time Oil* are distinguishable from those in this case. *Time Oil* involved the contamination of a major aquifer, the South Tacoma Channel Aquifer. In addition, the exclusionary language in the policy reviewed there is far broader than the language in the LMC policy, barring coverage not only for contamination of "any watercourse or body of water" but also any "bog, marsh, swamp or wetland." Id. at 1409. In reaching its decision, the court in *Time Oil* noted that this "broad language," id. at 1410, "clearly and unequivocally reflects an intent to exclude cleanup of any and all water." Id. at 1411.

Moreover, as PPL points out, at least one court has held that the common and ordinary meaning of the term "body of water" in a policy exclusion does not preclude coverage for contaminated groundwater. *State v. Travelers Indem. Co.*, 508 NYS2d 698, 701 (A.D. 1986) (involving coverage of seepage into groundwater of petroleum from a service station's underground gas tanks).

The issue is complicated by the fact that the term "body of water" is a term of common usage, not a precise or scientific geological term, while the testimony regarding the particular water contaminated is given in scientific and technical terms. PPL's expert, Harry LeGrand, a hydrogeologist of considerable experience, testified he was familiar with the hydrogeology literature and knew of no reference in the literature to the term "body of water" in connection with groundwater. It is apparent from our review of numerous cases in other jurisdictions that some groundwater *may* be a "body of water," particularly major aquifers. See, e.g., *Time Oil*, supra; *State of South Dakota v. Kansas City Southern Indus.*, 880 F2d 40, 41 (8th Cir. 1989) (describing a certain aquifer as "an enormous, mostly subterranean body of water"); *Lizotte v. Conservation Comm. of Somers*, 582 A2d 1186, 1190 (Conn. 1989) (referring to aquifers as bodies of water); *George v. Commonwealth, Dept. of Environmental Resources*, 517 A2d 578, 580, n. 9 (Pa. 1986) (noting that under Pennsylvania statute, aquifer *or another body of water* may be significant source of water for public water supply systems); *Mosley v. Johnson*, 453 P2d 149, 152 (Utah 1969) (referring to "aquiferous strata" as "water bodies"). We have found no case, however, setting forth a special or different test or rationale for determining whether particular groundwater is encompassed within the term "body of water." Accordingly, we apply the same criteria to groundwater as are employed in ordinary usage to determine whether surface water is a "body of water."

Since the word water has a clear and unambiguous meaning, we need only define the word "body" as used in this context. The American Heritage Dictionary (2d college ed. 1991) illustrates one definition of the word "body" — "[a] bounded aggregate of matter" — with the term "a body of water." We find this to be the accepted and ordinary

meaning of the term "body of water": an aggregate of water having defined boundaries.

We must then take the technical expert testimony regarding the nature of the water found under the surface of the site in issue in this case, and determine whether this *particular* described groundwater falls within the purview of the policy exclusion that uses the common and ordinary language meaning of the term "body of water."[2]

The same dictionary defines aquifer as "[a] water-bearing rock, rock formation, or group of rock formations." In an affidavit submitted by PPL on summary judgment, plaintiff's expert LeGrand defined an aquifer as a groundwater system in which "the quantity of water is sufficient to supply water to wells and springs." He testified at deposition that the groundwater system at the North Carolina site is an aquifer only "in a technical sense" and certainly not a major one.

That courts in other jurisdictions, particularly in western states, have held that aquifers are "bodies of water" is not dispositive of the issue in this case. It is apparent that aquifers differ in different geographic regions. LeGrand stated in his affidavit that in the Piedmont region, where the contaminated site is located, "[t]here are no horizontal bedded formations containing extensive aquifers and confining beds, which typify other areas." The groundwater rather consists "of either the water held in the small openings between sand grains and clay particles in the soil and saprolite zones or in the small fractures in the underlying bedrock." He stated both at deposition and by affidavit that in his expert opinion the contamination in issue in this case involved no "body of water." Using LeGrand's description of the groundwater in issue and applying the ordinary meaning of "body of water" we reach the same conclusion: because the groundwater at the site in issue is not bounded by "confining beds," although it is technically an aquifer, it is not a "body of water."

This conclusion also is more in keeping with principles of Georgia law regarding the construction of contracts. Being a matter of law for the court, an issue involving the construction of contracts may properly be disposed of by summary judgment. *Graphic Prep v. Graphcom*, 206 Ga. App. 689, 691 (1) (426 SE2d 183) (1992). Under Georgia law, "[c]ontracts of insurance are to be construed strictly against the insurer and in favor of the insured when language contained therein is susceptible to two or more constructions. Where the insurer grants coverage to an insured, it must define any exclusions in

---

[2] Black's Law Dictionary defines a "water course" as "[a] running stream of water . . . usually flowing in a particular direction." The definition notes that water flowing underground may be a water course if it flows in "a known and well defined channel." LMC makes no argument that the groundwater at this site is a "watercourse." This is understandable, given that the expert testimony showed that it was not.

its policy clearly and distinctly. [Cits.]" *American Southern Ins. Co. v. Golden*, 188 Ga. App. 585, 586 (373 SE2d 652) (1988). The exclusion in issue in this case is ambiguous in describing the items for which coverage was barred. Therefore, the trial court was obligated to construe it more favorably toward finding coverage, using the applicable rules of contract interpretation, OCGA § 13-2-1, including the rule codified in OCGA § 13-2-2 (2): "Words generally bear their usual and common signification." Applying these principles of Georgia law persuades us as well that the language of the policy exclusion in issue in this case, specifically the term "body of water," was not intended to apply to the groundwater found at this site, as defined by the expert testimony. The trial court properly granted summary judgment to PPL and denied summary judgment to LMC on this ground.

*Judgment affirmed. Pope, C. J., and McMurray, P. J., concur.*

DECIDED JUNE 30, 1994 —
RECONSIDERATION DENIED JULY 15, 1994

*Whitehurst & Frick, Stephen P. Riexinger*, for appellant.
*Hunton & Williams, K. Dennis Sisk, Lawrence J. Bracken II, Edward T. Floyd*, for appellee.