**MESA OPERATING COMPANY and Hugoton Capital Limited Partnership, Appellants,**

v.

**CALIFORNIA UNION INSURANCE COMPANY, Appellee.**

No. 05–96–00986–CV

Court of Appeals of Texas, Dallas.

Feb. 2, 1999.

Rehearing Overruled April 6, 1999.

---

47. *Id.*

Barry F. Cannaday, Guy I. Wade, III, Jenkins & Gilchrist, P.C., Dallas, for Appellant.

Scott R. Hoyt, Thomas D. Boyle, Peter D'apice, Gibson, Dunn & Crutcher, Dallas, for Appellee.

Before Justices LAGARDE, KINKEADE, and MORRIS.

## OPINION

JOSEPH B. MORRIS, Justice.

At issue in this case is whether an umbrella liability insurance policy provides coverage for alleged pollution damages. California Union Insurance Company denied coverage contending that a pollution exclusion in its policy barred the insured, Mesa Operating Company, from recovering. After Mesa brought suit, both parties moved for summary judgment. The trial court granted summary judgment in favor of Cal Union. We conclude, however, that neither party demonstrated its entitlement to summary judgment as a matter of law. We reverse the trial court's judgment and remand the case for further proceedings.

### FACTUAL BACKGROUND

Mesa Operating Company operated certain oil and gas properties in Kansas for Hugoton Capital Limited Partnership.[1] In connection with its operations, Mesa used an underground well to dispose of salt water captured along with the oil and gas. In early 1983, Mesa plugged and abandoned the well. Later that year, it was discovered that the well's casing had corroded, causing salt water to escape into a fresh water aquifer. A landowner who used the aquifer for irrigation sued Mesa alleging that his crops were damaged as a result of the leak. The Kansas Department of Health and Environment intervened seeking a court order requiring Mesa to cure the contamination.

Mesa settled with the landowner, agreeing to pay him $360,000 and to restore the condition of his land. Additionally, Mesa entered into a consent order with Kansas to conduct a "remediation program" to cure the aquifer. Mesa has paid over $1,000,000 as a result of the contamination and estimates that total costs of the remediation program will exceed $2,000,000.

At the time the leak was discovered, Mesa had both primary and umbrella comprehensive general liability insurance. Mesa submitted a claim for coverage to its primary carrier, National Union Fire Insurance Company of Pittsburgh. The primary policy contained two endorsements that Mesa contended covered the contamination: a "Saline Substances Contamination Coverage" endorsement and an "Underground Resources and Equipment Coverage" endorsement. The Saline Substances Contamination Coverage endorsement specifically provided coverage for property damage to oil, gas, water, or other mineral substances if caused directly or indirectly by a saline substance. Under the Underground Resources and Equipment Coverage endorsement, National Union insured Mesa for property damage to oil, gas, water, or other mineral substances that have not been reduced to physical possession. National Union initially denied the claim, but ultimately agreed to pay $825,000 as a compromise settlement.

Mesa then sought coverage for the excess damages under its umbrella policy. Relying on a "pollution exclusion" contained in the umbrella policy, Cal Union denied coverage. Mesa instituted this suit, seeking a declaration that Cal Union is obligated, in an amount up to the policy limits, to pay for damages over $1,000,000 incurred by Mesa as a result of the salt water leak.

Both sides moved for summary judgment. The sole ground asserted in Cal Union's motion was that the pollution exclusion in the umbrella policy barred Mesa's recovery as a matter of law. Mesa responded that the umbrella policy continues the coverages provided by the National Union primary policy. According to Mesa, because the primary policy provided coverage for the damages at issue, the umbrella policy provided coverage as a matter of law. After the trial court granted summary judgment in favor of Cal Union, Mesa appealed.

### DISCUSSION

In seven points of error, Mesa contends the trial court erred in granting Cal Union's motion for summary judgment and also by failing to grant Mesa's motion for summary

---

1. For convenience and clarity we will refer to both Mesa Operating Company and Hugoton Capital Limited Partnership as "Mesa."

judgment. Mesa relies on the saline contamination and underground resources endorsements found in the primary policy. Mesa concedes that the umbrella policy has no similar endorsements and generally excludes coverage for pollution. Mesa argues in its first three points of error, however, that the umbrella policy incorporates the pollution coverages provided by the primary policy, thus rendering the umbrella policy's "pollution exclusion" inapplicable. Cal Union responds that the umbrella policy is independent of the primary policy and separately defines the terms and conditions of coverage. Cal Union points to the first page of the policy, which states that Cal Union agrees to insure Mesa "subject to all of the terms" of the umbrella policy.

■ The umbrella policy sets forth its limit of liability in relationship to underlying primary insurance in a section entitled "Retained Limit—The Company's Limit of Liability." Within that section is a clause addressing coverage under the umbrella policy once the aggregate limits of the primary insurance have been reduced or exhausted. The umbrella policy states that:

> If the aggregate limits of liability of the underlying insurance listed in the Schedule of Underlying Insurance are reduced or exhausted because of personal injury, property damage, or advertising injury during the period of this policy, [Cal Union] will, subject to the company's limit of liability stated above, continue such coverage as is afforded by such listed underlying insurance for the remainder of the policy year of such underlying insurance in excess of the reduced or exhausted limits.

This language clearly indicates that the umbrella insurance will continue coverage for all occurrences covered by the primary insurance once the aggregate limits of the primary insurance have been reached.

2. In general, a "per occurrence" limit of liability is the highest amount an insurer may be obligated to pay for each occurrence covered by the policy. An "aggregate" limit of liability is the total amount the insurer may be obligated to pay during the term of the policy regardless of the number of occurrences.

Cal Union argues that this "continued coverage" is subject to the terms and conditions set forth in the umbrella policy, including the pollution exclusion. In other words, Cal Union takes the position that the umbrella policy continues the coverage provided by the primary policy only if the coverage is also available under the umbrella policy. Such an interpretation renders the phrase "as is afforded by ... underlying insurance" meaningless. Although the umbrella policy states that Cal Union agrees to insure Mesa "subject to all of the terms of [the] policy," one of those terms is that the umbrella policy will provide coverage under the conditions set out in the underlying primary insurance once the aggregate limits of the primary insurance have been met.

■ A basic rule of contract construction is that the preferred interpretation is one that provides meaning to every provision and does not read any term out of the contract. *Eagle Life Ins. Co. v. G.I.C. Ins. Co.,* 697 S.W.2d 648, 651 (Tex.App.—San Antonio 1985, writ ref'd n.r.e.). The contract must be considered as a whole, and each part of the contract should be given effect. *Ohio Cas. Group of Ins. Cos. v. Chavez,* 942 S.W.2d 654, 658 (Tex.App.—Houston [14th Dist.] 1997, writ denied). With these rules in mind, we read the umbrella policy to continue the coverage provided by the primary policy once the aggregate limits of the primary policy have been reduced or exhausted. Where a non-aggregate limit of liability has been reached, however, such as a "per occurrence" limit, Cal Union's obligation to continue coverage will not be triggered.[2] Accordingly, to determine whether Cal Union had an obligation to continue coverage for the salt water contamination in this case, we must first determine whether the underlying policy covered the contamination and, if so, whether the aggregate limits of the coverage were reduced or exhausted.[3]

3. Mesa urges an even broader reading of the umbrella policy and argues that, under all circumstances, the policy covers all the same risks or "follows form" to the underlying primary policy. Although it is generally true that umbrella policies are designed to provide excess coverage for risks covered in the underlying policy, we cannot conclude that an umbrella policy covers

As stated above, the underlying policy contains two endorsements that Mesa contends covers the damages caused by the salt water leak: the "Saline Substances Contamination Coverage" endorsement and the "Underground Resources and Equipment Coverage" endorsement. The language of each endorsement appears to cover the salt water contamination at issue.[4] Indeed, Cal Union does not dispute this. The primary policy, however, contains a pollution exclusion similar to the one contained in the umbrella policy. We must determine, therefore, what impact the pollution exclusion in the primary policy has on the endorsements as they apply to the contamination at issue.

■■■■ Endorsements to a policy generally supersede and control over conflicting printed terms within the main policy. *Mutual Life Ins. Co. v. Daddy$ Money, Inc.,* 646 S.W.2d 255, 259 (Tex.App.—Dallas 1982, writ ref'd n.r.e.). Often, endorsements are issued to add coverages that would otherwise be excluded. Yet, an endorsement cannot be read apart from the main policy, and the added provisions will only supersede the previous policy terms to the extent they are truly in conflict. *See Westchester Fire Ins. v. Heddington Ins. Ltd.,* 883 F.Supp. 158, 165 (S.D.Tex.1995), *aff'd,* 84 F.3d 432 (5th Cir. 1996). The policy and endorsement should be construed together unless they are so much in conflict that they cannot be reconciled. 4 HOLMES' APPLEMAN ON INSURANCE 2d, § 20.1 (1998).

■■■ The primary policy excludes coverage for

bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; . . . .

This exclusion does not apply, however, if the discharge, dispersal, release, or escape is "sudden and accidental." If applied to the saline contamination endorsement, the primary policy's pollution exclusion would exclude coverage for all damages described within the endorsement except for damages caused by a sudden and accidental discharge of saline. Yet, a sudden and accidental discharge of saline would be covered under the terms of the main policy and the endorsement would be superfluous. We conclude that the saline contamination endorsement and the pollution exclusion are irreconcilable. Because the two provisions cannot be reconciled, we also conclude the saline contamination endorsement supersedes the pollution exclusion and provides coverage for the contamination at issue. This coverage under the

the same risks under the same terms as the underlying policy unless the umbrella policy clearly and explicitly states that it does so. The Cal Union umbrella policy states that it will continue the same coverages provided by the underlying insurance only when the aggregate limits of the underlying insurance have been reduced or exhausted. A construction of the umbrella policy to provide continued coverage under the same terms as the underlying primary insurance under all circumstances would read the aggregate limits clause out of the policy.

4. The Saline Substances Contamination Coverage endorsement provides:

It is agreed that with respect to operations performed by or on behalf of the Named Insured and described in this endorsement:

1. The insurance applies to property damage included within the saline substance contamination hazard.
2. "Saline substance contamination hazard" included [sic] property damage to any of the following wherever located:

(a) oil, gas, water or other mineral substances, if the property damage is caused directly or indirectly by a saline substance;
(b) any other property, if the property damage results from the property damage described in subdivision (a) of this hazard.

The Underground Resources and Equipment Coverage endorsement provides:

It is agreed that the following additional provisions apply with respect to property damage included within the underground resources and equipment hazard arising out of the operations performed by or on behalf of the named insured and described in this endorsement:
* * *

"underground resources and equipment hazard" includes property damage to any of the following:

(a) oil, gas, water or other mineral substances which have not been reduced to physical possession above the surface of the earth or above the surface of any body of water;
* * *

primary policy must be continued by Cal Union under the umbrella policy if the aggregate limits of the saline contamination endorsement have been reduced or exhausted.

█ In contrast, we conclude the pollution exclusion in the primary policy does not conflict with the Underground Resources and Equipment Coverage endorsement. Unlike the saline contamination endorsement, the underground resources endorsement states that its provisions are *in addition* to those of the main policy. Specifically, the endorsement states that "the following *additional* provisions apply with respect to property damage included within the underground resources and equipment hazard . . . ." (emphasis added). This language clearly indicates that the terms of the main policy remain in effect with respect to underground resources and equipment coverage, and the endorsement was intended to augment, rather than supersede, those terms.

Although the language of the underground resources and equipment endorsement is broad enough to cover salt water contamination of a fresh water aquifer, the endorsement is clearly intended to cover more damages than those caused by pollution. For example, damage to oil, gas, or water under the endorsement may be caused by the depletion of another person's reservoir. The exclusion of coverage for non-sudden and non-accidental pollution would not render the endorsement meaningless. The endorsement and the exclusion, therefore, may be construed together.

█ Because the underground equipment and resource coverage endorsement does not supersede application of the pollution exclusion, the endorsement will only provide coverage if the contamination at issue does not fall within the terms of the exclusion. Mesa argues under its fifth, sixth, and seventh points of error that the exclusion does not apply as a matter of law or, in the alternative, there are material issues of fact regarding its application. Mesa first argues that the exclusion does not apply because the contamination of the aquifer was "sudden and accidental." In making this argument, Mesa urges us to construe the term "sudden" to mean unexpected or unintended. In re-

sponse, Cal Union contends the term "sudden" has a temporal aspect and must be interpreted to mean quick or abrupt. Because it is undisputed that the salt water leak continued over a long period of time, Cal Union argues the discharge cannot be considered sudden as a matter of law.

Courts across the country have exhaustively analyzed the meaning of the term "sudden" as it is used in insurance policy pollution exclusions. But the issue is one of first impression for Texas state courts. Both the Fifth Circuit and the United States District Court for the Northern District of Texas have concluded that, under Texas law, the phrase "sudden and accidental" must be interpreted to have a temporal component. *See Mustang Tractor & Equip. v. Liberty Mut. Ins.,* 76 F.3d 89, 91 (5th Cir.1996); *SnyderGeneral Corp. v. Century Indem. Co.,* 907 F.Supp. 991, 997 (N.D.Tex.), *aff'd in part and vacated in part,* 113 F.3d 536 (5th Cir. 1997). For the following reasons, we agree.

The term "sudden" has several recognized meanings, among which are "unexpected" and "unintended." *Webster's Third New International Dictionary* 2284 (1993). To determine its meaning in this case, the term must be read within the context of the policy. To read the word "sudden" in the pollution exclusion to mean only unexpected and unintended would make it redundant of the word "accidental." *Mustang Tractor,* 76 F.3d at 92; *SnyderGeneral,* 907 F.Supp. at 997. The term "accidental" already encompasses the concepts of being unexpected and unintended. *See Mustang,* 76 F.3d at 92. In contrast, common usage of the term "sudden" includes a temporal aspect.

Although no Texas court has previously addressed this issue, Mesa argues that there is Texas authority resolving the meaning of the term "sudden" in its favor. Mesa relies on the case of *Pioneer Chlor Alkali v. Royal Indemnity Co.,* 879 S.W.2d 920 (Tex. App.—Houston [14th Dist.] 1994, no writ). In *Pioneer Chlor,* an insured sought coverage under its boiler and machinery policy for damages arising when a corroded pipe burst releasing forty-two tons of chlorine into the surrounding atmosphere. *Id.* at 924. The insurance company denied cover-

age stating that, because the damages resulted from the gradual corrosion of a pipe, the occurrence did not fall within the definition of a covered "accident." *Id.* at 937. Under the policy, an accident was defined as the "sudden and accidental" breakdown of an object or a part of an object. *Id.* at 925.

In concluding there was coverage, the court in *Pioneer Chlor* did not directly address the issue of whether the phrase "sudden and accidental" included a temporal component. To the extent it did so inferentially, its conclusions are not clear. At one point the court opined that "[t]he actual penetration of the tubes was unexpected and unforeseen, complying precisely with the definitions of 'sudden' and 'accidental.'" *Id.* at 937. Yet, the court also stated that "while the corrosion/erosion mechanism that caused the holes in the [tubes] was slow, the breach of the tubes was instantaneous, and therefore, sudden and accidental." *Id.* From the discussion in the opinion, it appears that the court's focus was on defining the event that constituted the "accident" rather than on the meaning of the term "sudden." The court concluded that the sudden and accidental breakdown occurred when the pipe burst and that the gradual nature of the *cause* of the breakdown was irrelevant. The bursting of the pipe and consequent explosive release of chlorine into the atmosphere occurred abruptly. The breakdown, therefore, was sudden and accidental even if the word "sudden" is given its temporal meaning. *Pioneer Chlor* does not support Mesa's interpretation of the pollution exclusion. *See also Snyder-General,* 907 F.Supp. at 997–99 (concluding analysis in *Pioneer Chlor* is inapplicable to meaning of pollution exclusion).

■■■ Mesa points to the fact that there is a split of authority nationwide regarding the meaning of the word "sudden" in pollution exclusions. Mesa argues that this split of authority suggests the term is ambiguous. In Texas, ambiguous terms within insurance contracts are read in favor of the insured. *See Grain Dealers Mut. Ins. Co. v. McKee,* 943 S.W.2d 455, 458 (Tex.1997) (if an ambiguity exists, the interpretation that most favors coverage for the insured will be adopted). A

split of authority alone, however, does not create an ambiguity as a matter of law. *See Union Pac. Resources Co. v. Aetna Cas. & Sur. Co.,* 894 S.W.2d 401, 405 (Tex.App.—Fort Worth 1994, writ denied). If it did, courts would no longer be free to reach their own conclusions regarding contract interpretation once other courts had developed differing interpretations. *See T.C. Bateson Const. Co. v. Lumbermens Mut. Cas. Co.,* 784 S.W.2d 692, 698 (Tex.App.—Houston [14th Dist.] 1989, writ denied).

Mesa further contends that giving the term "sudden" its temporal meaning in the context of the policy renders it inconsistent with the term "accident." Specifically, Mesa argues that the term "accident" is defined within the term "occurrence." The primary policy defines "Occurrence" to mean "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured." Mesa contends it would be nonsensical to provide coverage for pollution only in cases where the discharge was abrupt *and* involved continuous or repeated exposure to conditions. Mesa's argument is not well taken.

Although the word "accident" is used within the definition of the term "occurrence," it is not itself defined, as other words are, for purposes of a uniform use throughout the policy. Indeed, the fact that the drafters specifically included "continuous or repeated exposure to conditions" within the definition of "occurrence" suggests that the word "accident" would not commonly be understood to encompass such events. The definition of the term "occurrence" can be read consistently with the term "sudden" even if "sudden" is given its temporal meaning. In effect, the policy may cover occurrences of continued or repeated exposure to conditions unless those conditions involve pollution, in which case the discharge must have occurred abruptly. *See U.S. Fidelity & Guar. v. Star Fire Coals, Inc.,* 856 F.2d 31, 34 (6th Cir. 1988).

■■■ Mesa urges this Court to review the drafting history of the standard pollution exclusion, which it states demonstrates the

insurance industry's intent to give the word "sudden" a non-temporal meaning. We conclude, however, that within the context of the pollution exclusion, the word "sudden" unambiguously requires the pollution to occur in a quick or abrupt manner. *See Mustang,* 76 F.3d at 92. Where contract language is unambiguous, extrinsic evidence is inadmissible to contradict or vary the meaning of the agreement. *See Nat'l Union Fire Ins. v. CBI Indus.,* 907 S.W.2d 517, 521–22 (Tex. 1995) (evidence of industry-wide discussions inadmissible to demonstrate intent behind unambiguous absolute pollution exclusion); *see also LaFarge Corp. v. Travelers Indem. Co.,* 118 F.3d 1511, 1517 (11th Cir.1997).

 Finally, Mesa argues that even if the word "sudden" is held to mean "quick" or "abrupt," the salt water contamination at issue happened "suddenly." Mesa reasons that the discharge occurred suddenly because at one point in time the well was whole and, an instant later, salt water breached the well and began escaping into the aquifer. According to Mesa, the fact that the leak was not discovered for a lengthy period of time does not negate the temporal suddenness with which the breach occurred. This argument has been described as the "metaphysical moment" theory. *See SnyderGeneral,* 907 F.Supp. at 1001. Under the logic of this theory, every event or condition not existing from the dawn of time would be considered "sudden" because at one moment it did not exist and the next moment it did. While we agree that the time of discovery does not control whether the discharge was sudden, we also conclude that a discharge that continues over a lengthy period of time cannot be considered "sudden" as a matter of law. *See id.* (suddenness of discharge may be determined by examining the period of time that commences with the release of the contaminant and terminates with the cessation of the flow). For example, if evidence showed that a container burst, releasing a finite amount of pollution into the surrounding area within

a short period of time, this discharge could be considered sudden even though its existence was not discovered for several years. Contrastingly, a leak of a pollutant that continues long past the point of the initial release will not be considered sudden.

 In this case, Cal Union presented evidence that the leak of salt water from the underground well into the aquifer continued over a period of years until it was discovered.[5] Mesa presented no contrary evidence and does not appear to dispute this fact. Accordingly, we conclude that the discharge of salt water at issue here was not "sudden" as a matter of law.

 Mesa makes one other argument disputing the application of the pollution exclusion. By its terms the pollution exclusion applies only to pollution discharged into or upon land, the atmosphere or any water course or body of water. Mesa contends the aquifer into which the salt water was discharged does not fit into any of these categories and, specifically, does not fit within the definition of a "body of water." According to Mesa, the water in the aquifer is not a mass or "body" distinct from the sand and rock that also forms the aquifer.

Every court that has addressed this issue has concluded that major aquifers may be considered bodies of water. *See, e.g., Aetna Cas. & Sur. Co. v. Dow Chem. Co.,* 28 F.Supp.2d 440, 447 (E.D.Mich.1998); *Lumbermens Mut. Cas. Co. v. Plantation Pipeline Co.,* 214 Ga.App. 23, 447 S.E.2d 89, 92–93 (Ga.App.1994); *Time Oil Co. v. Cigna Property & Cas. Ins. Co.,* 743 F.Supp. 1400, 1410–11 (W.D.Washington, 1990). The summary judgment evidence shows that the aquifer in this case was very large and possibly the largest in the United States.

Mesa relies on *Lumbermens Mutual Casualty Co. v. Plantation Pipeline Co.* for the proposition that "groundwater" in general cannot be considered a "body of water" for

---

5. In its seventh point of error, Mesa generally contends that Cal Union failed to present any *competent summary judgment evidence* regarding application of the pollution exclusion. Mesa fails, however, to make any argument or challenge the competency of any specific piece of evidence. We do not address points of error unsupported by argument and authority. *See* Tex.R.App. P. 38.1(h); *Lewis v. Texas Utils. Elec. Co.,* 825 S.W.2d 722, 726 (Tex.App.—Dallas 1992, writ denied).

the purposes of a pollution exclusion. *See Lumbermens*, 447 S.E.2d at 93. *Lumbermens* is distinguishable. First, the court in *Lumbermens* acknowledges that a large aquifer may be a "body of water." *Id.* at 92. Second, the exclusion at issue in that case excluded only discharges "into or upon any watercourse or body of water." *Id.* at 91–92. Given this limited language, the court concluded that groundwater with indistinct boundaries did not fit within the pollution exclusion. *Id.* at 93. In contrast, the exclusion in Mesa's primary policy does not merely exclude coverage for discharges into water, but also discharges into or upon land or the atmosphere. If, as Mesa suggests, the salt water from the well leaked into sand and rock in which water was contained, then the discharge was into land resulting in the pollution of the aquifer. The leak here must be considered a discharge into land or water or some combination thereof. Regardless of how it is viewed, the terms of the exclusion clearly cover the discharge.

Based on the foregoing, we conclude that the pollution exclusion is applicable to the salt water contamination. Because the Underground Resources and Equipment Coverage endorsement is subject to the pollution exclusion, that endorsement does not provide coverage in this case.[6] Thus, coverage for Mesa under the primary policy was available only under the Saline Substances Contamination Coverage endorsement. Cal Union's obligation under the umbrella policy to continue that coverage could only arise if the aggregate limit of liability for the saline contamination coverage had been reduced or exhausted. Accordingly, to be entitled to summary judgment, Mesa must have produced summary judgment proof of the reduction or exhaustion of the aggregate limit.

The saline contamination endorsement does not specify a limit of liability. The primary policy states a general limit of liability in a "Single Limit Endorsement." The Single Limit Endorsement sets a "per occur-

rence" limit of liability of one million dollars for bodily injury and property damage. This one million dollar limit becomes an aggregate limit for certain specified coverages including "all Property Damage to which this coverage applies and described in any of the numbered applicable subparagraphs in the limits of [l]iability sections of the forms of the company." Mesa did not provide any evidence or argument that the saline contamination was property damage to which the aggregate limit in the Single Limit Endorsement or any other aggregate limit applied.

Mesa contends that in determining whether the "aggregate limits" of the underlying insurance have been met, we should not confine ourselves to the technical concept of "aggregate" versus "per occurrence" limits.[7] Mesa argues that once the underlying insurer has paid out all or substantially all the money it is obligated to pay, the aggregate limits of liability have been met under the commonly understood definition of "aggregate." Yet both the primary and the umbrella policy use the term "aggregate" in its technical sense when referring to limits of liability. We see no reason why the use of the term "aggregate" in the "continuation of coverage" clause should have a different meaning.

Because Mesa did not prove that an aggregate limit of liability had been reduced or exhausted, it failed to show that Cal Union's obligation to continue coverage had been triggered. Accordingly, Mesa did not demonstrate its entitlement to summary judgment. We overrule Mesa's first point of error. Furthermore, because we have determined that the pollution exclusion is applicable to the salt water contamination in this case and that this exclusion is not superseded by the Underground Resources and Equipment Coverage endorsement, we overrule Mesa's third, fifth, sixth and seventh points of error.

---

**6.** Because we have concluded that the Underground Resources and Equipment Coverage endorsement does not provide coverage for the salt water contamination at issue, it is unnecessary for us to address Mesa's argument for umbrella coverage under a portion of Cal Union's policy that purports to provide underground resource and underground equipment hazard coverage "insofar as coverage is available to the insured in the underlying insurances."

**7.** See note 2.

We sustain, however, Mesa's second point of error relating to the continuation of the primary policy's coverage for saline contamination. Because Cal Union has an obligation to continue this coverage once the primary policy's aggregate limit of liability has been reached, the trial court erred in granting Cal Union summary judgment based solely on the umbrella policy's pollution exclusion. Nonetheless, in its sixth reply point and its only cross-point of error, Cal Union sets forth two additional reasons why its summary judgment should be upheld: first, it asserts Mesa's claim was not one for "damages" as contemplated by the policy and, second, the contamination occurred outside the policy period. Neither of these grounds was urged in the trial court as a basis for granting Cal Union summary judgment. Therefore, these grounds cannot be used here to sustain the judgment. *See McConnell v. Southside Indep. Sch. Dist.*, 858 S.W.2d 337, 341 (Tex.1993). We overrule Cal Union's cross-point of error. Because we need not address these arguments, Mesa's fourth point of error regarding the "damages" issue is moot.

We reverse the trial court's judgment and remand the case for further proceedings.