**Opinion filed August 29, 2014**



In The

# Eleventh Court of Appeals

_____

## No. 11-12-00029-CV

_____

## PLANTATION PIPE LINE COMPANY, Appellant

## V.

## HIGHLANDS INSURANCE COMPANY, IN RECEIVERSHIP, Appellee

**On Appeal from the 261st District Court**
**Travis County, Texas**
**Cause No. D-1-GN-10-004057**

### O P I N I O N

This appeal involves the meaning and application of certain terms of an excess insurance policy issued by Highlands Insurance Company to its insured, Plantation Pipe Line Company.[1] The trial court granted Highlands's motion for summary judgment and held that Highlands was not obligated to pay Plantation

---

[1]Highlands was placed in receivership in Texas on November 6, 2003.

under the terms of the excess policy that it had issued to Plantation because the underlying insurers had not actually paid the full limits of their policies. The trial court also denied Plantation's motion for partial summary judgment for the same reason. We reverse and remand.

Plantation operates pipelines that carry petroleum products from Louisiana to Mississippi, Alabama, Georgia, South Carolina, North Carolina, and Virginia. The pipelines do not extend into Texas. One of the properties through which Plantation's pipeline passed was known as the Stifford Ferry Site in Mecklenberg County, North Carolina.

On March 19, 1975, it was discovered that there was a leak in one of Plantation's underground pipelines that was located across the Stifford Ferry Site. Plantation repaired the leak immediately after it was discovered, informed the North Carolina Department of Environmental Health and Natural Resources (North Carolina DEHNR) of the leak, collected 2,000 barrels of oil in remediation and recovery operations over nine years, and spent approximately $18,663 in recovery costs, including a payment to the property owner, Finch. *See Lumbermens Mut. Cas. Co. v. Plantation Pipeline Co.*, 447 S.E.2d 89, 90 (Ga. App. 1994). Fourteen years later, in 1989, a North Carolina partnership, Stifford Ferry Road Properties contracted to acquire the property. Stifford Ferry Road Properties complained about residual gasoline contamination. At that time, further investigation by the North Carolina DEHNR revealed that Plantation's efforts had not resulted in complete remediation of the leak site. In 1990, the State of North Carolina directed Plantation to further remediate the leak site. Thereafter, Plantation recovered over 200,000 more gallons of leaked petroleum materials. Plantation spent close to $12 million on remediation as a result of the leak.

Before the leak was discovered, Johnson and Higgins of Georgia, Inc., an insurance broker in Atlanta, Georgia, assisted Plantation in the procurement of

2

multiple layers of liability insurance.  With the assistance of its broker, Plantation purchased a general liability insurance policy from American Reinsurance Company.  The policy was for $900,000 in excess of the $100,000 self-insured retention by Plantation.  Plantation also purchased excess insurance from California Union Insurance Company.  Cal Union's policy had a $2 million ceiling on top of American's $1 million coverage.  Additionally, Plantation purchased a "Comprehensive Catastrophe Liability Policy" of excess insurance from Lumbermens Mutual Casualty Insurance Company.  This policy coverage began at $3 million and covered up to $8 million.  Finally, Plantation also purchased a three-year "Special Risk Policy" from Highlands.  This policy was in excess of the "underlying coverage."  In summary, at times relevant to this lawsuit, Plantation's liability coverage was layered as follows:

1. $0 to $100,000                      Self-Insured
2. $100,000 to $1 million              American
3. $1 million to $3 million            Cal Union
4. $3 million to $8 million            Lumbermens
5. $8 million to $18 million           Highlands

Less than a month after the State of North Carolina notified Plantation of the need for further remediation, Plantation notified its insurance carriers that the State of North Carolina was requiring it to perform further remedial action under North Carolina pollution control laws and that it faced potential liability to third parties. Plantation requested that the insurers defend and indemnify it.

American, Cal Union, and Lumbermens all disputed coverage.  The companies claimed that notice was untimely and that the loss was subject to pollution exclusions in their policies.  Ultimately, Plantation sued American, Cal Union, and Lumbermens for breach of contract, among other things, in state court in Georgia.  Plantation did not sue Highlands at that time because it did not then

3

know whether the loss would be in an amount that would trigger the Highlands policy.

The end result of the Georgia lawsuit was that, in settlement of the claims, American agreed to pay Plantation $750,000.  Cal Union agreed to pay $1 million to Plantation.  And Lumbermens agreed to pay Plantation $2.8 million but expressly stated that, by that payment, Lumbermens did not acknowledge existence of coverage under its policy.  Plantation paid the balance of the loss.

On September 15, 2003, Plantation notified Highlands that Plantation had incurred losses in connection with the leak that exceeded $8 million; it demanded indemnity and reimbursement from Highlands for the excess over that amount. Plantation and Highlands were in contact periodically after that, but in 2003, before the Highlands claim was resolved, a district court in Travis County, Texas, placed Highlands into receivership.  Plantation filed a proof of claim in the receivership proceeding and argued that Highlands was responsible for all the remediation costs that had been incurred that exceeded $8 million.  In response, Highlands claimed, among other things, that it did not owe Plantation anything under its policy because the policy limits of the other insurance policies had not been fully exhausted as was required under the excess policy that it had issued to Plantation.  Highlands, therefore, denied Plantation's claim.

After Highlands denied Plantation's claim, Plantation sued Highlands for, among other things, breach of contract.  Highlands moved for summary judgment on the exhaustion question.  Plantation moved for partial summary judgment on the same issue.  The trial court agreed with Highlands that Highlands was not liable because the other insurers settled their claims with Plantation for less than their various full policy limits and because they had neither paid, nor had they been held liable to pay, the full limits on their individual policies.  Accordingly, the trial court granted summary judgment in favor of Highlands, denied Plantation's motion

for partial summary judgment, and ordered that Plantation take nothing on its claim against Highlands. That judgment forms the basis of Plantation's complaints in this appeal.

Plantation presents us with one issue on appeal. That issue is: "[w]hether the trial court erred in ruling that Plantation, as a matter of law, forfeited all of its coverage under the excess policy it purchased from Highlands by settling its coverage claims against its lower-level insurers for less than the full limits of those policies, even though Plantation agreed to pay the difference between the underlying settlement amounts and the underlying policy limits."

The standard of review of a summary judgment is well-settled. *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546 (Tex. 1985); *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671 (Tex. 1979). We review a summary judgment de novo. *Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010). The movant for traditional summary judgment must show there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *See* TEX. R. CIV. P. 166a(c); *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). A defendant who moves for traditional summary judgment must either negate at least one essential element of the nonmovant's cause of action or prove all essential elements of an affirmative defense. *See Randall's Food Mkts., Inc. v. Johnson*, 891 S.W.2d 640, 644 (Tex. 1995). When summary judgment is granted on traditional grounds, we take the evidence adduced in favor of the nonmovant as "true" and draw every reasonable inference and resolve all doubts in its favor. *Id.* at 644 (citing *El Chico Corp. v. Poole*, 732 S.W.2d 306, 315 (Tex. 1987)). If the trial court's order on summary judgment does not specify the grounds on which it is based, the appellant must negate all grounds on appeal. *See Star-Telegram, Inc. v. Doe*, 915 S.W.2d 471, 473 (Tex. 1995).

General rules of contract interpretation and construction govern a court's review of an insurance policy. *Utica Nat'l Ins. Co. of Tex. v. Am. Indem. Co.*, 141 S.W.3d 198, 202 (Tex. 2004). Our primary concern is to give effect to the intentions of the parties as expressed in the policy. *Balandran v. Safeco Ins. Co. of Am.*, 972 S.W.2d 738, 741 (Tex. 1998).

Policy terms are to be given the normal and usual meanings ascribed to them by an ordinary person. *Am. Home Assur. Co. v. Safway Steel Prods. Co., A Div. of Figgie Int'l, Inc.*, 743 S.W.2d 693, 702 (Tex. App.—Austin 1987, writ denied). When policy terms are not ambiguous, they are given their "plain, ordinary and generally accepted meaning unless the instrument itself shows that the terms have been used in a technical or different sense." *Ramsay v. Maryland Am. Gen. Ins. Co.*, 533 S.W.2d 344, 346 (Tex. 1976) (citing *Guardian Life Ins. Co. of Am. v. Scott*, 405 S.W.2d 64 (Tex. 1966); *W. Reserve Life Ins. Co. v. Meadows*, 261 S.W.2d 554 (Tex. 1953)).

Texas courts will enforce an insurance policy, as written, if the language used is free from any ambiguity and has only one reasonable interpretation. *Fiess v. State Farm Lloyds*, 202 S.W.3d 744, 746 (Tex. 2006); *Glover v. Nat'l Ins. Underwriters*, 545 S.W.2d 755 (Tex. 1977). In addition, we construe insurance policies and their endorsements together unless they are so much in conflict they cannot be reconciled. *See Mesa Operating Co. v. Cal. Union Ins. Co.,* 986 S.W.2d 749, 754 (Tex. App.—Dallas 1999, pet. denied). If the contract is subject to more than one reasonable interpretation, the agreement is ambiguous and courts will apply the interpretation that most favors the existence of coverage. *Grain Dealers Mut. Ins. Co. v. McKee*, 943 S.W.2d 455, 458 (Tex. 1997). An ambiguity does not exist just because the parties take differing and conflicting positions regarding the proper interpretation of the agreement. *Id.* However, if the language is ambiguous, the construction that is more favorable to the insured and affords

6

coverage will be adopted.  *Id.*   This principle of construction against the insurer and in favor of the insured is especially strong when the court considers exceptions and words of limitation.  *Blaylock v. Am. Guarantee Bank Liability Ins. Co.*, 632 S.W.2d 719, 721 (Tex. 1982).

In this court, Highlands takes the position that the policy it issued to Plantation is not ambiguous and should be enforced as written.  As the foundation for its argument, Highlands refers to what it calls the "exhaustion clause" in the policy that it issued to Plantation.  It argues that "[t]he Exhaustion Clause in the Highlands Policy states that liability shall attach only after the underlying umbrella insurers 'have paid or have [been] held liable to pay' their full policy limits."  But "full policy limits" is not what the policy before us actually says—it does not use the term "full policy limits."  The actual language in the Highlands policy appears in the policy under the heading: "Limit of Liability—Underlying Limits."  That section provides, in relevant part, as follows:

> It is expressly agreed that liability shall attach to the Company only after the Underlying Umbrella Insurers have paid or have been held liable to pay the full amount *of their respective ultimate net loss liability as follows:*
>
> A.      $5,000,000.            *ultimate net loss* in all in
>                                             respect of each occurrence . . .
>
> and the Company shall then be liable to pay only the excess thereof up to a further
>
> B.      $10,000,000.          *ultimate net loss* in all in
>                                             respect of each occurrence . . .
>                                             (emphasis added).

The phrase "full policy limits" might be unambiguous, as Highlands argues, but Highlands did not include those words in the policy it issued to Plantation; those words appear only in Highlands's brief.  The words actually used in the

policy, "ultimate net loss liability" and "ultimate net loss," are not defined in the Highlands policy. However, the term "ultimate net loss" is defined in the Lumbermens policy. And, the Highlands policy provides:

> This Policy is subject to the same terms, definitions, exclusions and conditions (except as regards the premium, the amount and limits of liability and except as otherwise provided herein) as are contained in or as may be added to the Underlying Umbrella Policies prior to the happening of an occurrence for which claim is made hereunder.

Therefore, the Highlands policy directs us to look to the Lumbermens policy to determine what "ultimate net loss" means. There, we find the following definition:

> "Ultimate net loss" means the total of the following sums arising out of any one occurrence to which this policy applies:
>
> (a) all sums which the insured *or* any organization as his insurer, *or both*, become legally obligated to pay as damages, whether by reason of adjudication *or settlement*, because of personal injury, property damage or advertising liability; and
>
> (b) all expenses incurred by the insured or any organization as his insurer, or both, in the investigation, negotiation, settlement and defense of any claim or suit seeking such damages, excluding only (1) the salaries of the insured's or insurer's regular employees, (2) office expenses of the insured or any insurer, and (3) all expenses included in other valid and collectible insurance (emphasis added).

If we take the Highlands clause regarding limitation of liability and insert part (a) of the definition of "ultimate net loss" in place of the words "ultimate net loss," we would read the provision as follows:

> It is expressly agreed that liability shall attach to the Company only after the Underlying Umbrella Insurers have paid or have been held liable to pay the full amount of all sums which the insured *or* any organization as his insurer, *or both*, become legally obligated to pay as damages, whether by reason of adjudication *or settlement*, because

8

of personal injury, property damage or advertising liability (emphasis added).

Highlands has not disputed that Plantation and the other carriers *altogether* have paid a sum in excess of the attachment point ($8 million) of the Highlands policy. We believe that the language in the Highlands policy is unambiguous, and we see nothing that requires payment of losses solely by the insurers up to the attachment amount in the Highlands policy.

If it were otherwise, then the Limits of Liability provision would directly conflict with the so-called "Maintenance Clause." The "Maintenance Clause" in the Highlands policy reads as follows:

> It is a condition of this Policy that the Underlying Umbrella Policies shall be maintained in full effect during the currency hereof except for any reduction of the aggregate limits contained therein solely by payment of claims in respect of accidents and/or occurrences occurring during the period of this Policy. Failure of the Named Insured to comply with the foregoing shall not invalidate this policy but in the event of such failures, the Company shall only be liable to the same extent as they would have been had the Named Insured complied with the said condition.

Under this provision, it would not matter whether the underlying policies were even effective—much less the source of the payment for the loss—the Highlands policy would still attach, but not until its attachment point of $8 million was reached. To read the Limits of Liability clause and the Maintenance clause in any other way would result in a conflict between the two provisions. We are to harmonize and give effect to all the contractual provisions so that none are rendered meaningless. *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 230 (Tex. 2003). Accordingly, we perceive the import of the Maintenance clause to be unrelated to the Limits of Liability clause; the clear purpose of the Maintenance Clause is to provide that Highlands is not required to "drop down" and pay

9

anything under its attachment point of $8 million. Plantation has made no claim that Highlands "drop down" below its attachment point of $8 million.

Highlands relies on *Citigroup, Inc. v. Federal Insurance Co.*, 649 F.3d 367, 370–73 (5th Cir. 2011), in support of its position. Citigroup was the successor-in-interest to Associates First Capital Corporation. Associates had purchased a primary insurance policy from Lloyd's with a limit of $50 million. *Id.* There were two other layers of insurance above the primary policy. *Id.* The secondary layer was composed of National Union Fire Insurance Company of Pittsburgh ($25 million excess coverage) and Starr Excess Liability Insurance International, Ltd. ($25 million excess coverage). *Id.* The third layer was known as the "Quota Share Layer" and provided an additional $100 million in excess coverage. *Id.* That amount was shared at varying levels by seven additional insurers. *Id.* Claims were made against the insurers. *Id.* Citigroup settled its claims against Lloyd's for $15 million of its $50 million policy limits. Some of the excess insurance companies settled, and some of the other claims became the subject of arbitration. *Id.* Ultimately, there were five excess insurers that remained involved in the lawsuit made the subject of the Citigroup appeal: Federal Insurance Company, Steadfast Insurance Company, St. Paul Mercury Insurance Company, SR International Business Insurance Company, and Twin City Insurance Company. *Id.*

The district court granted summary judgment in favor of the excess carriers because Citigroup settled with its primary carrier, Lloyd's, for less than its $50 million limit; therefore, in accordance with the terms of the excess policies, the excess carriers' liability limits did not attach. *Id.* The Fifth Circuit agreed. *Id.* Citigroup argued that the *Zeig* doctrine applied and that the policies were ambiguous and should, therefore, be construed in favor of the insured. *See Zeig v. Mass. Bonding & Ins. Co.*, 23 F.2d 665 (2d Circuit 1928). As the court stated in

*Citigroup*, "*Zeig* stands for the proposition that, if an excess insurance policy ambiguously defines 'exhaustion,' settlement with an underlying insurer constitutes exhaustion of the underlying policy, for purposes of determining when the excess coverage attaches." *Citigroup*, 649 F.3d at 371 (citing TOD I. ZUCKERMAN, SETTLEMENT WITH PRIMARY INSURER FOR LESS THAN POLICY LIMITS § 10:22 (2010)). The court declined to apply *Zeig* because the policy provisions in the *Citigroup* appeal were not ambiguous.

The court in *Citigroup* pointed out that the language in the Federal policy provided that coverage attached only after "(a) all Underlying Insurance carriers have paid in cash the full amount of their respective liabilities, (b) the full amount of the Underlying Insurance policies have been collected by the plaintiffs, the Insureds or the Insureds' counsel, and (c) all Underlying Insurance has been exhausted." *Citigroup*, 649 F.3d at 372. The court held that the language of the policy clearly provided for payment, in cash, of the full amount of the liability of the underlying insurer's limits. *Id.*

The St. Paul policy provided that St. Paul's coverage did not attach until the underlying policy's "total" limit had been paid in "legal currency." According to the court in *Citigroup*, "[t]hus, the plain language of the St. Paul policy dictates that payment by an underlying insurer for less than $50 million will not trigger St. Paul's excess coverage." *Id.*

The court noted that coverage under the SR policy attached "only after any Insurer subscribing to any Underlying Policy shall have agreed to pay or have been held liable to pay the full amount of its respective limits of liability as set forth in . . . the Declarations" ($50 million). *Id.* The plain language of the policy issued by SR required payment of the "full amount" before SR was obligated to provide coverage to Citigroup.

11

As far as the Steadfast policy was concerned, it provided that coverage attached "[i]n the event of the exhaustion of all of the limit(s) of liability of such 'Underlying Insurance' solely as a result of payment of loss thereunder." *Id.* at 373. The court held that the policy required that "all" of the underlying carrier's limits had to be exhausted before coverage attached. "Furthermore, the use of the phrase 'payment of loss' establishes that the underlying insurer must make *actual* payment to the insured in order to exhaust the underlying policy." *Id.*

The Highlands policy in this case did not contain language like the parties agreed to in the policies in *Citigroup*. We have set forth the language from the policy in this case, and after comparing the provisions here with the provisions in *Citigroup*, we remain convinced that the language in the Highlands policy is not ambiguous. As a result, we need not decide, as a matter of first impression, whether the *Zeig* doctrine applies in the State of Texas.

Even if we are wrong in our assessment that the policy terms involved in this appeal are unambiguous, the result of this appeal would be no different. If an insurance contract is subject to more than one reasonable interpretation, the agreement is ambiguous and courts will apply the interpretation that most favors the existence of coverage. *Grain Dealers Mut. Ins. Co.*, 943 S.W.2d at 458. We must assume that Plantation's interpretation of the policy is reasonable because of our earlier holding. For purposes of argument only, we assume that Highlands presents a reasonable interpretation of the policy. If the language of an insurance policy is ambiguous, the construction that is more favorable to the insured and affords coverage will be adopted. *Id.* This principle of construction against the

insurer and in favor of the insured is especially strong when the court considers exceptions and words of limitation. *Blaylock*, 632 S.W.2d at 721.[2]

Therefore, based upon these common principles, were we required to apply them, we would still find under either Texas or Georgia law that the trial court erred when it held that the settlement with the other insurers for less than their policy limits failed to trigger the Highlands policy.

We hold that, under the terms actually contained in the Highlands excess policy, coverage was triggered regardless of the settlement between Plantation and all of its other insurers. The trial court erred to hold otherwise. Plantation's sole issue on appeal is sustained.[3]

We reverse the judgment of the trial court, and we remand this cause to the trial court for further proceedings consistent with this opinion.[4]

MIKE WILLSON

JUSTICE

August 29, 2014

Panel consists of: Wright, C.J.,
Willson, J., and Bailey, J.

---

[2]Because there is no conflict between Georgia law and Texas law on these principles, there are no conflict of laws issues that we need to address on the point of contract construction. *See Claussen v. Aetna Cas. & Sur. Co.*, 380 S.E.2d 686, 687–88 (Ga. 1989).

[3]We have not addressed any issues regarding conflict of laws arguments because we do not find them relevant to the limited issue presented to this court in this appeal.

[4]When cross-motions for summary judgment are filed and the trial court grants one and denies the other, we review all issues presented and enter the judgment that the trial court should have entered. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005); *Moon Royalty, LLC v. Boldrick Partners*, 244 S.W.3d 391, 394 (Tex. App.—Eastland 2007, no pet.). However, here, Plantation has asked only that we reverse the judgment of the trial court and remand this case to that court for further proceedings consistent with our decision.