**TIG INSURANCE COMPANY,**
Appellant,

v.

**SAN ANTONIO YMCA, d/b/a YMCA of San Antonio, Appellee.**

No. 04–04–00017–CV.

Court of Appeals of Texas,
San Antonio.

July 13, 2005.

Elizabeth G. Smith, Davis & Opper, P.C., W. Wendell Hall, Fulbright & Jaworski L.L.P., San Antonio, Amy L. Miner, Edward F. Rubbery, Robert W. Brunner, Bollinger, Rubbery & Garvey, Chicago, IL, for TIG Insurance Company.

Thomas G. Kemmy, Law Office of Thomas G. Kemmy, Brian L. Blakeley, Blakeley & Reynolds, P.C., Pat Maloney, Jr., Law Office of Pat Maloney, P.C., San Antonio, for appellee.

Sitting: CATHERINE STONE, Justice, SANDEE BRYAN MARION, Justice, PHYLIS J. SPEEDLIN, Justice.

## OPINION

Opinion by SANDEE BRYAN MARION, Justice.

This is an appeal from the denial of a motion for summary judgment filed by appellant, TIG Insurance Company, and the granting of a motion for summary judgment filed by appellee, San Antonio YMCA d/b/a YMCA of San Antonio. The below suit is a declaratory judgment action filed by TIG and involves the construction of an insurance contract issued by TIG to the YMCA.

## BACKGROUND

The YMCA operates a youth camp in Hunt, Texas known as YMCA Camp Flaming Arrow. In the summer of 1999, Kenneth Trimble, a YMCA counselor, allegedly sexually and physically assaulted six children attending the camp. The parents or guardians of the children sued the YMCA for negligent hiring practices. Three of the lawsuits were collectively settled for $6 million, with TIG contributing $1 million towards the settlement.

To resolve the issue of whether the YMCA had coverage under the TIG insurance policy for the remaining three lawsuits, TIG filed a petition for declaratory judgment, asserting the $1 million payment towards the settled lawsuits exhausted the policy limits and it had no duty to defend the YMCA in the remaining lawsuits. TIG subsequently moved for summary judgment on the grounds that the policy's coverage for acts of sexual abuse was limited to a single occurrence, the incidents of sexual abuse alleged by all six children and the negligent hiring allegations against the YMCA were a single occurrence under the policy, the policy limits of $1 million for each occurrence were exhausted by the settlement payment, and, as a result, TIG had no duty to defend the YMCA in the remaining lawsuits.

The YMCA filed a cross-motion for summary judgment on the grounds that a separate new "occurrence" was triggered for each victim of Trimble's alleged abuse; therefore, the policy limits have not been exhausted. The YMCA also argued TIG had a duty to defend against allegations of physical abuse that did not involve sexual abuse.

The trial court denied TIG's motion, granted the YMCA's motion, and declared TIG had a continuing duty to defend the YMCA in the remaining lawsuits and the YMCA was entitled to indemnity in each of the lawsuits, "subject only to the exhaustion of the policy's aggregate limit." This appeal by TIG ensued.

## STANDARD OF REVIEW

Summary judgment movants have the burden of showing there are no genuine

issues of material fact, and that they are entitled to summary judgment as a matter of law. *Nixon v. Mr. Prop. Mgmt. Co.,* 690 S.W.2d 546, 548 (Tex.1985). In deciding whether there is a disputed issue of material fact, evidence favorable to the nonmovant must be taken as true, every reasonable inference must be indulged in favor of the nonmovant, and all doubts must be resolved in his or her favor. *Id.* at 548–49.

When both parties file motions for summary judgment, each must carry its burden and neither may prevail because of the failure of the other to discharge its burden. *Villarreal v. Laredo Nat'l Bank,* 677 S.W.2d 600, 605 (Tex. App.-San Antonio 1984, writ ref'd n.r.e.). Where there are competing motions for summary judgment, and one is granted and the other denied, the appellate court determines all questions presented to the trial court. *Jones v. Strauss,* 745 S.W.2d 898, 900 (Tex.1988). The reviewing court may affirm the judgment or reverse the judgment and render the judgment the trial court should have rendered, including rendering judgment for the other movant. *Id.*

### THE TIG POLICY

TIG issued an insurance policy to the YMCA that contains a General Liability Section, included in which is a Commercial General Liability Coverage Form ("the CGLCF"). The declaration page of the policy contains a $2 million "General Aggregate Limit" and a $1 million "Each Occurrence Limit." The policy also contains a Sexual Abuse Occurrence Coverage endorsement form. At the top of this form, above the title, is the statement: "THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY." Below the title is the statement: "This endorsement modifies coverage provided under the following COMMERCIAL GENERAL LIABILITY COVERAGE FORM." The endorsement then lists various additions or amendments to the CGLCF. Below are the pertinent sections of the CGLCF, with the italicized language representing the language from the Sexual Abuse Occurrence Coverage endorsement form that modifies the CGLCF.

Section I of the CGLCF, entitled "Section 1–Coverages," contains three grants of coverage: "Coverage A. Bodily Injury and Property Damage Liability," "Coverage B. Personal and Advertising Injury Liability," and "Coverage C. Medical Payments." Coverage A states as follows:

1. Insuring Agreement

 . . .

 b. This insurance applies to "bodily injury" and "property damage" only if

 (1) the "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; and

 (2) The "bodily injury" or "property damage" occurs during the policy period.

 c. Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury."

 d. *This insurance applies to "bodily injury" caused by a "Sexual Abuse Occurrence."*

Section III of the CGLCF, entitled "Limits of Insurance," states as follows:

1. The Limits of Insurance shown in the Declarations and the rules below fix the amount we will pay regardless of the number of:

 a. Insureds;

b. Claims made or "suits" brought; or

c. Persons or organizations making claims or bringing "suits".

2. The General Aggregate Limit is the most we will pay for the sum of

 a. Medical expenses under coverage C;

 b. Damages under Coverage A, except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard"; and

 c. Damages under Coverage B.

3. The Products–Completed Operations Aggregate Limit is the most we will pay. . . .

 . . .

4. *Subject to 2. or 3. above, whichever applies, the Each Occurrence Limit is the most we will pay for the sum of:*

 a. *Damages under Coverage A; and*

 b. *Medical expenses under Coverage C*

 *because of all "bodily injury" and "property damage" arising out of any one "occurrence" or any one "Sexual Abuse Occurrence."*

Section V of the CGLCF, entitled "Section V–Definitions," includes a variety of definitions, including the following:

3. "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

*3.a. The term "bodily injury" includes mental anguish or emotional distress if such mental anguish or emotional distress:*

 (i) *Directly results from physical contact during a "Sexual Abuse Occurrence," or*

 (ii) *Directly results from the claimant actually witnessing a "Sexual*

*Abuse Occurrence" whether or not there is a physical contact between the claimant and the perpetrator(s).*

 . . .

9.a. *A "Sexual Abuse Occurrence" is defined and conditioned as follows:*

 (1) *A "Sexual Abuse Occurrence" means a single act, or multiple, continuous, sporadic, or related acts of sexual molestation or abuse caused by one perpetrator, or by two or more perpetrators acting together. "Sexual Abuse Occurrence 'includes' Negligent Employment" of any person accused of or involved in such sexual molestation or abuse. A "Sexual Abuse Occurrence" must occur while the claimant is in the care, custody or control of:*

 (i) *An insured, or*

 (ii) *A person or entity indemnified under an "Insured Contract" pursuant to which the Named Insured has legal responsibility for the person or entity.*

 (2) *All acts of "Sexual Abuse Occurrence" by an actual or alleged perpetrator or perpetrators, including "Negligent Employment" of such perpetrator or perpetrators, shall be deemed and construed as one occurrence which takes place when the first act of sexual molestation or abuse occurs, regardless of the number of persons involved, or the number of incidents or locations involved, or the period of time during which the acts of sexual molestation or abuse took place.*

 (3) *No coverage is afforded under this policy if the first act of a "Sexual Abuse Occurrence" took place outside this policy period.*

9.b. *"Negligent Employment" means negligence, or alleged negligence, in the employment, investigation, supervision, training or retention in employment or volunteer status, of any person for whom the Named Insured is or was ever legally responsible and whose conduct or alleged conduct is within the definition of "Sexual Abuse Occurrence."*

. . .

12. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

Although TIG raises several issues on appeal, the central issues are (1) whether the CGLCF and the Sexual Abuse Occurrence Coverage form each provide a separate grant of coverage; (2) whether each of the six sexual abuse lawsuits constitute a single "Sexual Abuse Occurrence"; and (3) whether TIG has a duty to defend the YMCA on plaintiffs' allegations of physical abuse.

## INTERPRETATION OF AN INSURANCE CONTRACT

■ A contract of insurance is generally subject to the same rules of construction as other contracts. *Forbau v. Aetna Life Ins. Co.,* 876 S.W.2d 132, 133 (Tex. 1994); *National Union Fire Ins. v. Hudson Energy Co.,* 811 S.W.2d 552, 555 (Tex. 1991). The court's primary concern is to give effect to the written expression of the parties' intent. *Forbau,* 876 S.W.2d at 133.

■ If the court is uncertain as to which of two or more meanings was intended, a provision is ambiguous. *See Butler & Binion v. Hartford Lloyd's Ins.,* 957 S.W.2d 566, 569 (Tex.App.-Houston [14th Dist.] 1995, writ denied). Whether a contract is ambiguous is a question of law to be decided by looking at the contract as a whole in light of the circumstances present when the contract was executed. *See National Union Fire Ins. v. CBI Indus., Inc.,* 907 S.W.2d 517, 520 (Tex.1995). Only after a court has determined a contract is ambiguous may it consider the parties' interpretations. *Id.* When language of a policy is susceptible to more than one construction and is ambiguous, the language should be strictly interpreted against the insurer and liberally in favor of the insured. *Hudson Energy,* 811 S.W.2d at 555. On the other hand, if the written contract is worded so that it can be given a definite or certain legal meaning, it is not ambiguous and will be enforced as written. *CBI Indus.,* 907 S.W.2d at 520. When a contract is not ambiguous, the court will construe the contract as a matter of law. *See Coker v. Coker,* 650 S.W.2d 391, 393 (Tex.1983).

■ When construing the policy's language, we must give effect to all contractual provisions so that none will be rendered meaningless. *American Mfrs. Mut. Ins. Co. v. Schaefer,* 124 S.W.3d 154, 157 (Tex.2003). Endorsements to a policy generally supersede and control over conflicting printed terms within the main policy. *Mesa Operating Co. v. California Union Ins.,* 986 S.W.2d 749, 754 (Tex.App.-Dallas 1999, pet. denied); *see also INA of Texas v. Leonard,* 714 S.W.2d 414, 416 (Tex.App.-San Antonio 1986, writ ref'd n.r.e.). Endorsements often are issued to add coverages that otherwise would be excluded. *Mesa Operating Co.,* 986 S.W.2d at 754. Yet, an endorsement cannot be read apart from the main policy, and the added provisions will only supersede the previous policy terms to the extent they are truly in conflict. *Id.* When terms are defined in an insurance policy, those definitions control the interpretation of the policy. *Trinity Universal Ins. Co. v. Cowan,* 945 S.W.2d 819, 823 (Tex.1997).

"Reliance on defined terms in insurance policies to construe those contracts is necessary to determine the intent of the parties and integral to the application of basic principles of contract interpretation to insurance policies." *Provident Life & Accident Ins. v. Knott,* 128 S.W.3d 211, 219 (Tex.2003).

**COVERAGE UNDER THE POLICY**

TIG argues that the Sexual Abuse Occurrence Coverage endorsement merely modifies, and does not add to, the coverage provided under the CGLCF. Based upon its interpretation of the policy, TIG asserts that a single "Sexual Abuse Occurrence" is alleged regardless of the number of persons involved; the number of children involved; the number of incidents involved; the number of locations involved; and the period of time during which the sexual abuse takes place. TIG also asserts it does not have a continuing duty to defend the YMCA in the remaining lawsuits because the policy limits have been exhausted. According to TIG, the trial court erred in determining it has a duty to indemnify the YMCA in each of the lawsuits, subject only to the policy's aggregate limit of $2 million, because the acts of Trimble constitute one occurrence and TIG has already paid the maximum single occurrence limit of $1 million.

The YMCA argues, on the other hand, that the CGLCF, standing alone, provides coverage for the claims asserted against it by the plaintiffs in the six lawsuits. Under the YMCA's interpretation, a claim may trigger coverage as both an "occurrence" and as a "Sexual Abuse Occurrence." Therefore, according to the YMCA, because each claim for sexual assault triggered an "occurrence" under the CGLCF, the aggregate $2 million has not been exhausted. The YMCA's argument is premised on its interpretation of the CGLCF and the Sexual Abuse Occurrence Coverage endorsement as each providing a separate grant of coverage. The YMCA relies on *M.J.R. Corp. v. Scottsdale Insurance,* 803 S.W.2d 426 (Tex.App.-Dallas 1991, no writ), in support of its argument that the CGLCF grants coverage independent from that granted in the Sexual Abuse Occurrence Coverage form.

In *M.J.R.,* the court considered two policies (each issued by a different insurance company) that contained liability coverage applicable to third-party claims. Within the liability coverage, each policy contained two "insuring endorsements," each of which contained coverage language. *Id.* at 427–28. The premises-restricted endorsement obligated Scottsdale Insurance to pay on behalf of M.J.R. "all sums which the insured shall become legally obligated to pay as damages because of bodily injury or property damage to which this insurance applies, caused by an occurrence and arising out of the ownership, maintenance, or use of the insured premises...." *Id.* at 430. This endorsement also contained an exclusion, which provided that the insurance did not apply to bodily injury or property damage "arising out of operations on or from premises (other than insured premises) owned by, rented to, or controlled by the named insured...." *Id.* The other endorsement stated it was issued in consideration of the payment of the premium and was described as a "comprehensive general liability insurance endorsement." This endorsement obligated Scottsdale Insurance to "pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury or property damage to which this insurance applies, caused by an occurrence...." *Id.* This endorsement did not contain any exclusion restricting the coverage to any particular premises. *Id.*

The issue before the court was whether one or both of the endorsements restricted liability coverage to a specific premises. The court concluded that one endorsement was premises-restricted, while the other was not. *Id.* at 430. In reaching this conclusion, the court held as follows:

> .... Each coverage provision of each policy, along with its respective definitions and exclusions, must be read as separate and distinct. Although an attachment to an insurance policy upon a separate sheet of paper and the policy are to be construed together, and as one, it by no means follows that they constitute an indivisible contract. They are in fact two distinct contemporaneous contracts. Thus, the language of one of the contracts cannot be used to preclude the application of coverage under the other.

*Id.* at 430 (internal citations omitted).

■ Here, the TIG Sexual Abuse Occurrence Coverage form does not contain coverage language of its own. At the top of the form, above the title, is the statement: "THIS ENDORSEMENT CHANGES THE POLICY." Below the title is the statement: "This endorsement modifies coverage provided under the following COMMERCIAL GENERAL LIABILITY COVERAGE FORM." The endorsement then lists various additions or amendments to the CGLCF. Therefore, unlike the "separate and distinct" endorsements in *M.J.R.*, the Sexual Abuse Occurrence Coverage form in TIG's policy does not provide an additional grant of liability coverage such that a sexual abuse claim may trigger both an "occurrence" and a "Sexual Abuse Occurrence." Instead, the policy clearly and unambiguously provides that the provisions of the Sexual Abuse Occurrence Coverage form modify the provisions of the CGLCF.

We next consider the effect of this modification on a claim for sexual abuse. More specifically, we determine whether each of the six incidents of sexual abuse constitute a single "Sexual Abuse Occurrence." Under the policy, the insurance coverage provided by TIG applies to "bodily injury," which is defined as (1) "bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time"; (2) "mental anguish or emotional distress if such mental anguish or emotional distress" is a direct result of physical contact during or the claimant actually witnessing a "Sexual Abuse Occurrence"; and (3) bodily injury "caused by a Sexual Abuse Occurrence." The $1 million "Each Occurrence Limit" is the most TIG must pay for the sum of Coverage A damages and Coverage C medical expenses because of "all 'bodily injury' . . . arising out of any one 'occurrence' or any one 'Sexual Abuse Occurrence.'" Therefore, TIG's "Each Occurrence Limit" liability is limited to $1 million for any *one* Occurrence *or* any *one* Sexual Abuse Occurrence.

Courts construing the meaning of "occurrence" in policies that did not include an endorsement for sexual abuse focus on the events that cause the injuries and result in the insured's liability, and not on the number of injurious effects. *See H.E. Butt Grocery Co. v. National Union Fire Ins.*, 150 F.3d 526, 530 (5th Cir.1998) [1] (and Texas cases cited therein). The *H.E. Butt* court held that "the two independent acts

---

1. The policy definition of "occurrence" in *H.E. Butt* is substantially similar to that in the TIG policy: "an event, including continuous or repeated exposure to conditions, which result[s] in Personal Injury or Property Damage during the policy period, neither expected nor intended from the standpoint of the Insured. All Personal Injury or Property Damage arising out of the continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one occurrence."

of sexual abuse 'caused' the two children's injuries and gave rise to HEB's separate and distinct liability in each case." *Id.* at 531. The court concluded that the sexual molestation of different children constituted separate occurrences. *Id.* at 532. Likewise, we conclude that under TIG's policy, each instance of sexual abuse of a different child would be a different "occurrence." However, that does not end our inquiry because, under this policy, the issue is whether each instance in which a different child was sexually molested gives rise, not to six "occurrences," but to six Sexual Abuse Occurrences.

Under the TIG policy "*[a]ll acts of 'Sexual Abuse Occurrence' by an actual or alleged perpetrator or perpetrators, including 'Negligent Employment' of such perpetrator or perpetrators, shall be deemed and construed as one occurrence* which takes place when the first act of sexual molestation or abuse occurs, regardless of the number of persons involved, or the number of incidents or locations involved, or the period of time during which the acts of sexual molestation or abuse took place." (Emphasis added.) A

"Sexual Abuse Occurrence" means "a single act, or multiple, continuous, sporadic, or related acts of sexual molestation or abuse caused by one perpetrator, or by two or more perpetrators acting together."

Giving effect to all the provisions within the TIG policy, we conclude the Sexual Abuse Occurrence Coverage endorsement form limits coverage otherwise available under the basic CGCLF for "bodily injury" when that injury is caused by a Sexual Abuse Occurrence. Under the policy's unambiguous language, all of Trimble's alleged acts of sexual abuse, "regardless of the number of persons involved, or the number of incidents or locations involved, or the period of time during which the acts of sexual molestation or abuse took place," constitute a single Sexual Abuse Occurrence. *See Preferred Risk Mut. Ins. v. Watson*, 937 S.W.2d 148, 150 (Tex.App.-Fort Worth 1997, writ denied).[2] To interpret each of the six alleged sexual assaults as giving rise to six separate Sexual Abuse Occurrences would render the policy's distinctions between "occurrence" and "Sexual Abuse Occurrence" meaningless.

---

**2.** In *Preferred Risk,* three children were molested by an employee of Grace Temple Baptist Church's day care center. Preferred asserted the children's claims collectively constituted a single "occurrence." The children countersued, arguing that each child's claim constituted a separate "occurrence." *Id.* at 148–49. Unlike TIG's CGLCF, Preferred's CGL policy specifically excluded "bodily injury" and "personal injury" caused by abuse or molestation under a policy entitled "Abuse or Molestation Exclusion." However, Preferred's policy included another endorsement entitled "Sexual Misconduct Liability Coverage Form," which provided in pertinent part as follows:

All acts of sexual misconduct by one person, or two or more persons acting together, or any breach of duty causing or contributing to such acts will be considered one occurrence in determining our liability under this section.

*Id.* at 149. The court held that the definition of "occurrence" in the sexual misconduct endorsement unambiguously meant that "a single 'occurrence' is *'[a]ll* acts' of sexual molestation by either *'one* person, or two or more persons acting together, or any breach of duty causing or contributing to such acts.'" *Id.* at 150 (emphasis in original). The court concluded that " 'all' of the Grace Temple employee's alleged acts of sexual misconduct and 'any' alleged breach of duty that may have contributed to those acts, collectively constituted a single 'occurrence' under the policy in question." *Id.*

Although, unlike in *Preferred,* TIG's Sexual Abuse Occurrence Coverage endorsement was not issued to add coverage that was otherwise excluded under the CGCLF, we consider the *Preferred* court's interpretation of the definition of "occurrence" in its sexual misconduct endorsement helpful.

## CONTINUING DUTY TO DEFEND

■■■ TIG asserts it has no continuing duty to defend the YMCA in the pending lawsuits because (1) its $1 million payment in the settled lawsuits has exhausted its "Each Occurrence Limit" and (2) an occurrence for physical abuse separate and apart from sexual abuse has not been alleged. The policy states that TIG's duty to defend ends "when [it has] used up the applicable limit of insurance in the payment of judgments or settlements under Coverage A or B or medical expenses under Coverage C." TIG contends that because it paid $1 million in Coverage A damages to settle three of the lawsuits, the applicable limit of insurance has been "used up" and it, therefore, no longer has a duty to defend in the three pending lawsuits. We disagree.

Subject to applicable aggregate limits, the Each Occurrence Limit is the most TIG must pay for the sum of Coverage A damages and Coverage C medical expenses "because of all 'bodily injury' and 'property damage' arising out of any one 'occurrence' or any one 'Sexual Abuse Occurrence'." Trimble's alleged sexual abuse of the six children constitutes a single Sexual Abuse Occurrence. The Each Occurrence Limit is $1 million, and TIG's payment of $1 million in the settled lawsuits exhausted its policy limit for "any one 'Sexual Abuse Occurrence'." However, because the policy distinguishes between an "occurrence" and a "Sexual Abuse Occurrence," the payment of $1 million for a Sexual Abuse Occurrence does not result in the exhaustion of the Aggregate Limit if there is a separate "occurrence." Therefore, if, during the coverage period, the YMCA is held liable on a claim for bodily injury arising from "any one 'occurrence'," the remaining limits are available to satisfy that claim, triggering TIG's duty to indemnify. Accordingly, if the plaintiffs' petitions allege a claim for bodily injury

unassociated with sexual abuse, then TIG has a continuing duty to defend.

In its motion for summary judgment, the YMCA asserted the plaintiffs alleged physical assault separate from any allegations relating to sexual abuse. According to the YMCA, there is a "possibility" that "despite the Plaintiffs' best efforts to prove otherwise, a jury may determine that the type of physical contact that actually occurred was wrongful but not sexual in nature." Therefore, the YMCA argues that any liability on its part for Trimble's physical assault of the children is covered by the policy, and TIG has a continuing duty to defend for an occurrence that does not involve sexual abuse.

■■■ Whether an insurer of a liability policy is obligated to defend the insured is a question of law to be decided by the court. *State Farm Gen. Ins. v. White,* 955 S.W.2d 474, 475 (Tex.App.-Austin 1997, no pet.). The duty to defend is triggered by the factual allegations in the plaintiff's petition and the language of the insurance policy. *Cowan,* 945 S.W.2d at 821. This duty is unaffected by facts ascertained before suit, developed in trial, or by the ultimate outcome of the case. *See Argonaut Southwest Ins. v. Maupin,* 500 S.W.2d 633, 635–36 (Tex.1973). Instead, the allegations in the pleadings are considered in light of the policy language without reference to the truth or falsity of the allegations and without reference to what the parties know or believe. *Heyden Newport Chem. Corp. v. Southern Gen. Ins. Co.,* 387 S.W.2d 22, 24 (Tex.1965). If a petition does not allege facts within the scope of coverage, an insurer is not legally required to defend a suit against its insured. *American Physicians Ins. Exch. v. Garcia,* 876 S.W.2d 842, 848 (Tex.1994). On the other hand, if the underlying petition contains allegations that, when fairly

and reasonably construed, state a cause of action that is potentially covered by the policy, then the insurer has a duty to defend. *National Union Fire Ins. of Pittsburgh, PA v. Merchants Fast Motor Lines, Inc.,* 939 S.W.2d 139, 142 (Tex. 1997).

 We give the allegations in the petition a liberal interpretation, and we focus on the factual allegations that show the origin of the damages rather than on the legal theories alleged. *National Union,* 939 S.W.2d at 141. The *National Union* Court explained:

> Where the complaint does not state facts sufficient to clearly bring the case within or without the coverage, the general rule is that the insurer is obligated to defend if there is, potentially, a case under the complaint within the coverage of the policy. Stated differently, in case of doubt as to whether or not the allegations of a complaint against the insured state a cause of action within the coverage of a liability policy sufficient to compel the insurer to defend the action, such doubt will be resolved in insured's favor.

*Id.* (citations omitted). Accordingly, we resolve all doubts regarding the duty to defend in favor of the duty. *King v. Dallas Fire Ins.,* 85 S.W.3d 185, 187 (Tex. 2002).

Here, none of the petitions name Trimble as a defendant, only the YMCA is named. All petitions allege the YMCA was negligent or grossly negligent in its hiring, retention, staffing, and orientation and training practices, and that the YMCA breached its duty to the children to keep them safe from harm. In their petitions, the plaintiffs allege that, during the minor child's stay at Camp Flaming Arrow, "the child was physically, sexually, and mentally abused" by a YMCA employee and "the minor child suffered physical abuse." We conclude that, given its most liberal interpretation, these allegations suggest the possibility that the children's injuries may have resulted from physical abuse unassociated with sexual abuse or molestation. Therefore, the allegations in the plaintiffs' petitions state a cause of action potentially covered by the policy; thus, triggering TIG's duty to defend in these lawsuits.[3]

## CONCLUSION

We conclude that each of the six claims that Trimble sexually assaulted a child constitutes a single Sexual Abuse Occurrence under TIG's policy; therefore, TIG's payment of $1 million in the settled lawsuits exhausted its limit for "any one 'Sexual Abuse Occurrence.'" However, the

---

3. Relying on *Director of the Dallas County Child Protective Services v. Bowling,* 833 S.W.2d 730 (Tex.App.-Dallas 1992, no writ), TIG argues there is no distinction between physical and sexual abuse. In *Bowling,* the court held there was no basis for distinguishing between physical abuse and sexual abuse in a suit to involuntarily terminate parental rights because either has the effect of endangering the physical or emotional well-being of the child. *Id.* at 733. We do not believe *Bowling* is authoritative when interpreting an insurance contract. Relying on *State Farm Lloyds v. C.M.W.,* 53 S.W.3d 877 (Tex.App.-Dallas 2001, pet. denied), TIG also argues that intent to harm is inferred as matter of law in cases involving the sexual abuse of a minor. The *C.M.W.* case involved an insurer's obligation to indemnify and not its duty to defend. The *C.M.W.* court determined that intent to harm could be inferred from all of the insured's actions because those actions were not separate and independent from the physical sexual contact. *Id.* at 890–92. Here, the plaintiffs' petitions do not provide the level of detail necessary for us to determine, as a matter of law, whether Trimble's actions were related and interdependent on his sexual molestation of the children. *See id.* at 889–90 (holding that a determination of whether to infer intent to harm must be made on a case-by-case basis).

plaintiffs' petitions alleged a potential cause of action for physical abuse; therefore, TIG has a continuing duty to defend the YMCA in the remaining lawsuits. TIG's duty to indemnify the YMCA may arise dependent upon the actual facts adduced at trial. We affirm the trial court's judgment.