**REVERSE in part; AFFIRM in part and Opinion Filed May 25, 2022**



**In The**
**Court of Appeals**
**Fifth District of Texas at Dallas**

### No. 05-21-00071-CV

**CENTRAL MUTUAL INSURANCE COMPANY, Appellant**
**V.**
**RELIANCE PROPERTY MANAGEMENT, INC., Appellee**

**On Appeal from the 44th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-18-00856**

## MEMORANDUM OPINION

Before Chief Justice Burns, Justice Schenck, and Justice Partida-Kipness
Opinion by Chief Justice Burns

After a jury trial in this insurance coverage dispute, the trial court rendered judgment for appellee Reliance Property Management, Inc. on its claim against appellant Central Mutual Insurance Company. Central now appeals, alleging the trial court erred by denying its motion for directed verdict, by disregarding certain of the jury's answers and failing to disregard others, and by failing to render judgment for Central. Concluding that the trial court rendered judgment in accordance with the jury's verdict and the insurance policy's terms, but that there was no evidence to support one element of damages awarded by the jury, we affirm in part and reverse and render in part.

BACKGROUND

Reliance made a claim for a $220,000 loss under its 2016–17 commercial lines insurance policy issued by Central. Central denied the claim, citing certain conditions and exclusions in the policy. Reliance sued, seeking damages and attorney's fees for breach of contract, bad faith in an insurance transaction, and deceptive trade practices. The case proceeded to a jury trial, where the parties offered evidence about the loss and the policy.

**1. The loss**

Reliance is a small property management company that manages commercial properties. In May 2017, Reliance had three employees: Robert Grunnah, its owner and president, Debbie Molitor, its secretary and bookkeeper, and Alex Lilley, a property manager. Grunnah and Molitor worked from different office locations, so they usually communicated by email.

On Thursday, May 18, 2017, Molitor received an email that appeared to be from Grunnah asking if she could make online wire transfers. The email showed that it was sent from Grunnah's correct email address. It included his usual "signature block" bearing his name, address, phone numbers, and the company logo for "Younger Partners," where Grunnah's office was located. The parties have referred to the unknown sender of this and the other relevant emails as "Fake Robert."

Over the course of the following week, Fake Robert sent instructions to Molitor and Reliance's bank officers at BB&T Bank to authorize Molitor to make

wire transfers for Reliance. Molitor took the steps required by the bank, most notably taking physical signature cards to the real Grunnah's home to be signed. After further communications, Fake Robert sent Molitor an invoice for a $220,000 "Investment Project" in Hong Kong and instructed Molitor to send a wire transfer to pay it. Molitor went in person to the bank and completed a $220,000 wire transfer from Reliance's account on Thursday, May 25, 2017.

The following day, Molitor received another request from Fake Robert for additional transfers. Molitor testified that from the outset, she had been uncomfortable with the responsibility of making wire transfers. After consulting with Lilley, she called Grunnah to ask about the new request and discovered that Grunnah knew nothing about the $220,000 transfer. They immediately contacted the bank to attempt to stop the payment or obtain a refund, but were not able to do so.

Reliance filed a claim with Central under the policy. Central denied Reliance's claim by letter of July 14, 2017, stating that the policy did not cover the loss.

## 2. The policy

Reliance purchased a commercial lines policy from Central for the 2016-17 policy year. Reliance also paid Central an additional premium for the "Central Premier Plus® Property Extensions Coverage Endorsement" (the "Premier Plus endorsement").

The policy includes a "Special Form" entitled "Causes of Loss" ("Causes of Loss form"). Paragraph A of this form defines "Covered Causes of Loss" as "direct

physical loss unless the loss is excluded or limited in this policy." Paragraph B.2.i of the Causes of Loss form provides, under "Exclusions," "We will not pay for loss or damage caused by or resulting from any of the following: . . . Voluntary parting with any property by you or anyone else to whom you have entrusted the property if induced to do so by any fraudulent scheme, trick, device or false pretense." At trial and on appeal, Central has relied on this "Voluntary Parting" exclusion to argue that the policy does not cover Reliance's loss, although its letter denying Reliance's claim made no mention of it.

The Premier Plus endorsement specifically provides that it modifies the Causes of Loss form, among other coverages. The endorsement also states that "Coverage is amended by the following changes to Additional Coverages, Coverage Extensions, Condition[s] and Exclusions. All other Limitations, Conditions and Exclusions apply." In paragraph A.6.b, "Exclusions," the Premier Plus endorsement states that the listed exclusions "are added as respects the Crime Coverage provided by this endorsement" "[i]n addition to the Exclusions in Causes of Loss–Special Form."

The Premier Plus endorsement adds "Crime Coverages," including coverages for "Forgery or Alteration," "Computer and Funds Transfer Fraud," and "Fraudulent Impersonation," among others. The Premier Plus endorsement's "Forgery or Alteration" coverage paragraph provides in part:

2) a) We will pay for loss resulting directly from "forgery"[1] or alteration of checks, drafts, promissory notes, or similar written promises, orders or directions to pay a sum certain in "money" that are:

    i)     Made or drawn by or drawn upon you; or

    ii)    Made or drawn by one acting as your agent;
or that are purported to have been so made or drawn.

"Forgery" is defined in the Premier Plus endorsement as "the signing of the name of another person or organization with intent to deceive . . . ."

## 3. The trial

Molitor and Grunnah testified at trial about the events leading to the funds transfer and Reliance's subsequent communications with Central. William R. Hamm, a claims adjuster, testified on Central's behalf about Central's denial of the claim. Hamm was responsible for investigating the claim, but he did not interview either Molitor or Grunnah to determine what happened. Although Reliance had contacted both the police and the FBI, Hamm did not attempt to learn the scope or result of any law enforcement investigation. Hamm testified that he made his coverage decision based solely on one conversation with Lilley and a copy of a written timeline Molitor had prepared at the time she learned of the fraud. He admitted that when he wrote the letter to Reliance denying the claim, he did not consider or mention the Voluntary Parting exclusion. He confirmed his belief that Reliance was the victim of a crime and that no one at Reliance was involved in

---

[1] Terms in quotes are defined elsewhere in the policy.

perpetrating the fraud. And he testified that "[a]s we sit here today, there is a loss of $220,000."

Both parties moved for directed verdict on the Voluntary Parting exclusion. Central argued the exclusion applied to preclude any coverage under the Premier Plus endorsement. Reliance argued the opposite, that the Voluntary Parting exclusion did not apply to any of the coverages in the Premier Plus endorsement.

The trial court denied the parties' motions for directed verdict and submitted the case to the jury.

### 4. The verdict

The trial court's charge included 15 questions. The jury's answers to Questions 4, 5, 6, 7, 8, and 9 are at issue in this appeal. The jury found:

Question 4: Reliance suffered a loss resulting directly from "forgery,"

Question 5: Reliance's loss resulted from the voluntary parting with property induced by a fraudulent scheme,

Question 6: Central did not fail to pay the amount owed for losses under the policy,

Question 7: Not answered; the question inquired about the amount of damages resulting from Central's failure to pay, but the jury did not answer it because it was conditioned on an affirmative finding in response to Question 6,

Question 8: Central failed to comply with its duty of good faith and fair dealing to Reliance, and

Question 9: $25,000 would fairly and reasonably compensate Reliance for Central's failure to comply with its duty of good faith and fair dealing.

–6–

## 5. The judgment

Both parties moved for judgment based on the jury's favorable findings and requested the trial court to disregard the unfavorable findings. After a hearing, the trial court rendered judgment for Reliance in the principal amount of $220,000. The trial court also awarded Reliance the $25,000 in damages found by the jury in response to Question 9, as well as amounts for attorney's fees and interest.

This appeal followed.

## ISSUES

In six issues, Central contends the trial court erred by (1) failing to grant Central's motion for directed verdict; (2) disregarding the jury's answer to Question No. 5 that addressed the Voluntary Parting exclusion in the policy; (3) disregarding the jury's answer to Question No. 6 that Central did not fail to pay the amount owed for losses under the insurance policy; (4) failing to render judgment for Central in accordance with the jury's answer to Question No. 7 awarding no breach of contract damages; (5) failing to disregard the jury's answer to Question No. 4, the Forgery coverage question, and (6) failing to disregard the jury's answers to Question Nos. 8 and 9 regarding common law bad faith, and rendering judgment for Reliance on those claims.

## STANDARDS OF REVIEW

In reviewing the grant or denial of a motion for directed verdict or a motion for judgment notwithstanding the verdict (JNOV), we apply the standards for assessing the legal sufficiency of the evidence. *Helping Hands Home Care, Inc. v.*

*Home Health of Tarrant Cty., Inc.*, 393 S.W.3d 492, 515 (Tex. App.—Dallas 2013, pet. denied) (citing *City of Keller v. Wilson,* 168 S.W.3d 802, 823 (Tex. 2005)). A trial court properly denies a motion for directed verdict and a motion for JNOV if, looking at all the evidence in the light most favorable to the challenged fact or the jury's finding, a reasonable trier of fact could have formed a firm belief or conviction that the fact or finding was true. *Id.*

A directed verdict for a defendant may be proper when (1) a plaintiff fails to present evidence raising a fact issue essential to the plaintiff's right to recover, or (2) if the plaintiff either admits or the evidence conclusively establishes a defense to the plaintiff's cause of action. *Mauricio v. Castro*, 287 S.W.3d 476, 479 (Tex. App.—Dallas 2009, no pet.).

We review a trial court's grant of a judgment notwithstanding the verdict under a no-evidence standard, examining whether any evidence supports the jury's findings. *Gharda USA, Inc. v. Control Sols., Inc.*, 464 S.W.3d 338, 347 (Tex. 2015). In *Gharda USA, Inc.*, the supreme court explained:

No evidence exists when there is:

(a) a complete absence of evidence of a vital fact; (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; (d) the evidence establishes conclusively the opposite of the vital fact.

More than a scintilla of evidence exists when the evidence supporting the finding rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. When determining whether any evidence supports a judgment, we are limited to reviewing only the

evidence tending to support the jury's verdict and must disregard all evidence to the contrary. We view the evidence and possible inferences in the light most favorable to the verdict. If more than a scintilla of evidence supports the verdict, it must be upheld.

*Id.* (citations and quotation marks omitted).

In Texas, insurance policies are construed according to the ordinary rules of contract construction. *Am. Mfrs. Mut. Ins. Co. v. Schaefer,* 124 S.W.3d 154, 157 (Tex. 2003). In applying these rules, our primary concern is to ascertain the parties' intent as expressed in the language of the policy. *Kelley–Coppedge, Inc. v. Highlands Ins. Co.,* 980 S.W.2d 462, 464 (Tex. 1998). If an insurance contract uses unambiguous language, we will construe it as a matter of law and enforce it as written. *In re Deepwater Horizon*, 470 S.W.3d 452, 464 (Tex. 2015); *see also TIG Ins. Co. v. N. Am. Van Lines, Inc.*, 170 S.W.3d 264, 268 (Tex. App.—Dallas 2005, no pet.) ("If the contract can be given an exact or certain legal interpretation, it is not ambiguous, and we must interpret the insurance policy's meaning and intent from its four corners."). When possible, we must harmonize all of the provisions with reference to the entire agreement; no single provision should be read as controlling. *Coker v. Coker,* 650 S.W.2d 391, 393 (Tex.1983).

Whether policy language is ambiguous is a question of law. *Schaefer,* 124 S.W.3d at 157. Ambiguity does not arise simply because the parties offer conflicting interpretations; rather, ambiguity exists only when the contract is susceptible of two or more reasonable interpretations. *Id.* Moreover, ambiguity must be evident from the policy itself; it cannot be created by introducing parol evidence of intent. *Fiess*

*v. State Farm Lloyds,* 202 S.W.3d 744, 747 (Tex. 2006). "If a contract of insurance is susceptible of more than one reasonable interpretation, we must resolve the uncertainty by adopting the construction that most favors to the insured." *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Hudson Energy Co.,* 811 S.W.2d 552, 555 (Tex. 1991). As the supreme court recently explained, "If the parties offer reasonable but conflicting interpretations, we adopt the construction that favors coverage." *Dillon Gage, Inc. of Dallas v. Certain Underwriters at Lloyds Subscribing to Policy No. EE1701590*, 636 S.W.3d 640, 643 (Tex. 2021).

## DISCUSSION

### 1. Voluntary Parting exclusion (Issues 1 and 2)

Central argues that the Voluntary Parting exclusion applies and is unambiguous. Consequently, Central contends the trial court erred by denying its motion for directed verdict based on the exclusion, submitting the question to the jury, then disregarding the jury's "Yes" answer to Question 5. Although a question about this exclusion was submitted to the jury, the interpretation of the policy language is a question of law. *See Tex. Farm Bureau Mut. Ins. Co. v. Sturrock*, 146 S.W.3d 123, 126 (Tex. 2004) (courts construe unambiguous policy language as a matter of law). A jury's finding on a question of law may be deemed immaterial and disregarded. *Spencer v. Eagle Star Ins. Co. of America*, 876 S.W.2d 154, 157 (Tex. 1994).

–10–

The applicable coverage form in the policy is the "Commercial Property Coverage Part" that includes the "Building and Personal Property Coverage Form" ("BPP Coverage Form"), the Causes of Loss form where the Voluntary Parting exclusion is found, and the Premier Plus endorsement that amends the policy to add "Crime Coverage," including coverage for "Forgery or Alteration." The express language of the exclusion is "Voluntary parting with any property by you or anyone else to whom you have entrusted the property if induced to do so by any fraudulent scheme, trick, device or false pretense."

There is no specific reference to the Voluntary Parting exclusion in the Premier Plus endorsement. Instead, Central relies on general language in the Premier Plus endorsement that "All other Limitations, Conditions and Exclusions apply." Immediately before this language, however, the Premier Plus endorsement expressly states that it modifies the Causes of Loss form, where the Voluntary Parting exclusion is found.

Citing this Court's opinion in *Mesa Operating Co. v. California Union Insurance Co.*, 986 S.W.2d 749 (Tex. App.—Dallas 1999, pet. denied), Central argues that because the Premier Plus endorsement references the limitations, conditions, and exclusions in the "main policy," the Voluntary Parting exclusion must be applied to the Premier Plus coverages. As we explained in that case, however,

–11–

> Endorsements to a policy generally supersede and control over conflicting printed terms within the main policy. Often, endorsements are issued to add coverages that would otherwise be excluded. Yet, an endorsement cannot be read apart from the main policy, and the added provisions will only supersede the previous terms to the extent they are truly in conflict. The policy and endorsement should be construed together unless they are so much in conflict that they cannot be reconciled.

*Id.* at 754 (internal citations omitted). Applying this analysis, we reached differing conclusions on whether two coverage provisions in an endorsement superseded exclusions in the main policy. *See id.* at 754–55. Where the provisions could not be reconciled, we concluded the endorsement superseded the policy and provided coverage. *Id.*

In *Morris James LLP v. Continental Casualty Co.*, a case cited by Reliance, the court concluded that a "False Pretense Exclusion" and a "Forgery and Alteration Endorsement"—provisions similar to the Voluntary Parting exclusion and the forgery coverage here—were clear and unambiguous standing alone, but were ambiguous when read together. 928 F. Supp. 2d 816, 824–25 (D. Del. 2013). Morris James, a law firm, had been drawn into a scam involving its acceptance of a counterfeit check that it deposited in its bank account. It then wired the funds to a third party at the scammer's direction *See id.* at 819. Morris James filed a claim with Continental under its business property insurance policy after it was unable to recover the funds. *Id.* Continental denied the claim and Morris James sued. *Id.*

Both parties filed motions for summary judgment regarding coverage of Morris James's claim under the policy. *Id.* at 818. The False Pretense Exclusion in

–12–

the policy provided that Continental would not pay for loss or damage "caused by or resulting from . . . voluntary parting with any property . . . if induced to do so by any fraudulent scheme, trick, device or false pretense." *Id.* at 820. The Forgery and Alteration Endorsement provided coverage "for loss resulting directly from 'forgery' or alteration of checks, drafts, promissory notes, or similar written promises, orders or directions to pay a sum certain in money . . . ." *Id.*

After concluding that the scammer's counterfeit check fell within the policy's definition of "forgery," the court turned to the False Pretense Exclusion and found that it also applied: "Therefore, there is no serious dispute that, in addition to resulting from a forged instrument, the scam was a fraud which induced plaintiff to voluntarily part with $176,750, within the language of the False Pretense Exclusion." *Id.* at 823–24. The court then reasoned that because the loss fell within the plain meaning of both the forgery and false pretense provisions, the question "whether the loss is covered or excluded by the Policy hinges on which provision is interpreted to prevail, or "trump," the other when the Policy is interpreted as a whole." *Id*. at 824. The court found the policy to be ambiguous when the provisions were read together because the policy was unclear about the application of the exclusions to the coverages provided in the endorsements. *See id.* at 825. The court concluded that because the policy's language was ambiguous, the policy "should be interpreted in favor of the insured because the insurer is in control of the process of articulating the terms." *Id.*

Similarly here, we conclude that the Voluntary Parting provision's exclusion of losses in which the insured was "induced . . . by any fraudulent scheme, trick, device or false pretense" cannot be reconciled with the Premier Plus endorsement's express coverage of loss from fraud-based crimes such as forgery, defined as "the signing of the name of another person or organization with intent to deceive." The Premier Plus endorsement's express statement that it modifies the Causes of Loss form (where the Voluntary Parting exclusion is found) is followed only by a general statement that "[a]ll other Limitations, Conditions and Exclusions apply." If this non-specific language is read to require exclusion of all losses induced "by any fraudulent scheme, trick, device or false pretense," then the crime coverages offered in the endorsement would not apply to losses from fraud-based crimes, despite the policy's definitions of those crimes as involving "intent to deceive" or "fraudulent" conduct.

As in *Mesa Operating Co.* and *Morris James*, we conclude that because the Voluntary Parting provision cannot be reconciled with the Premier Plus endorsement, the Premier Plus endorsement's language controls. *See Mesa Operating Co.*, 986 S.W.2d at 754–55; *Morris James*, 928 F. Supp. 2d at 822, 825; *see also Dillon Gage, Inc. of Dallas*, 636 S.W.3d at 643 (if parties offer reasonable but conflicting interpretations, court adopts construction that favors coverage).[2] We

---

[2] Given this conclusion, we need not consider the parties' additional arguments regarding whether the Voluntary Parting exclusion applies to "Money" as defined in the Premier Plus endorsement. Further,

conclude the trial court did not err by denying Central's motion for directed verdict based on the Voluntary Parting exclusion and by disregarding the jury's "Yes" answer to Question 5 of the jury charge. *See Helping Hands Home Care, Inc.*, 393 S.W.3d at 515 (standard of review for directed verdict); *Spencer*, 876 S.W.2d at 157 (standards for disregard of jury's answer). We decide Central's first two issues against it.

## 2. Forgery provision of Premier Plus endorsement (Issue 5)

Question 4 of the jury charge addressed forgery, tracking the Premier Plus endorsement's language:

> Did Reliance suffer a loss resulting directly from "forgery" or alteration of checks, drafts, promissory notes, or similar written promises, orders or directions to pay a sum certain in "money" that are:
>
> i)      Made or drawn by or drawn upon Reliance; or
>
> ii)     Made or drawn by one acting as Reliance's agent, or that are purported to have been so made or drawn.
>
> Answer "Yes" or "No".
>
> Answer:___Yes___

Central argues that the trial court should have disregarded the jury's answer to Question 4 because there was no evidence presented at trial to support it. Central contends the Premier Plus endorsement's forgery coverage is limited to forgery of

---

because we have not construed the Voluntary Parting exclusion to preclude coverage for any portion of Reliance's loss, we need not address Central's arguments regarding concurrent causation. *Cf. Dallas Nat'l Ins. Co. v. Calitex Corp.*, 458 S.W.3d 210, 222–23 (Tex. App.—Dallas 2015, no pet.) (under concurrent causation doctrine, "when covered and non-covered perils combine to create a loss, the insured is entitled to recover that portion of the damage caused solely by the covered peril").

–15–

negotiable instruments and did not include the fraudulent emails and invoices in question here. Central cites several cases from other jurisdictions in support of its argument that "a fraudulent email instructing the insured to wire money is not a financial instrument as required for coverage under the forgery coverage." *See, e.g., Midlothian Enters., Inc. v. Owners Ins. Co.*, 439 F. Supp. 3d 737, 743 (E.D. Va. 2020) (email directing the insured to wire funds was not a "Covered Instrument" under the forgery or alteration endorsement of the insured's policy because it was not a negotiable instrument); *see also RSUI Indem. Co. v. The Lynd Co.*, 466 S.W.3d 113, 118 (Tex. 2015) ("When construing an insurance policy, we are mindful of other courts' interpretations of policy language that is identical or very similar to the policy language at issue.").

Reliance, in turn, relies on cases from other jurisdictions interpreting similar policy language and concluding that forgery coverage applied. *See, e.g., Ad Advert. Design, Inc. v. Sentinel Ins. Co. Ltd.*, 344 F. Supp. 3d 1175, 1183 (D. Mont. 2018) (four emails directing the insured to transfer funds to a specified account by wire transfer constituted a "direction[ ] to pay a sum certain in money" covered under the policy's forgery provision). Reliance also cites *Great American Insurance Company v. AFS/IBEX Financial Services, Inc.*, 612 F.3d 800 (5th Cir. 2010), in support of its argument that forgery coverage is not limited to negotiable instruments. *See id.* at 804–05 (giving the term "forgery" in an insurance policy its "plain, ordinary

meaning" rather than its interpretation in the "commercial paper context" under the UCC).[3]

As Central argues, more courts have reached the conclusion that forged emails or other false wire transfer authorizations or instructions are not negotiable instruments and consequently are excluded from forgery coverage. *See, e.g., Ryeco, LLC v. Selective Ins. Co.*, 539 F. Supp. 3d 399, 405–08 (E.D. Pa. 2021) (collecting cases and distinguishing *Ad Advertising* as an "outlier"). But neither party has cited binding authority that requires us to reach either conclusion. Consequently, we turn to the policy language and consider its application to the facts before us.

Here, the forgery or alteration coverage in the Premier Plus endorsement includes "loss resulting directly from 'forgery' or alteration of checks, drafts, promissory notes, or similar written promises, orders or directions to pay a sum certain in 'money' that are . . . Made or drawn by or drawn upon you . . . ." "Forgery" is defined as "the signing of the name of another person or organization with intent to deceive," and "signatures that are produced or reproduced electronically, mechanically, or by other means" are treated "the same as handwritten signatures." Although negotiable instruments such as checks, drafts, and promissory notes are

---

[3] But as Central points out, the same court previously held that because forged invoices "were not made, drawn by, or drawn upon [the insured] as those terms are used in the commercial paper context or under the Uniform Commercial Code," there was no coverage under the insured's crime policy. *See Travelers Cas. & Sur. Co. of Am. v. Baptist Health Sys.*, 313 F.3d 295, 299 (5th Cir. 2002) (citing *Parkans Int'l LLC v. Zurich Ins. Co.*, 299 F.3d 514, 517 (5th Cir. 2002)).

specifically included, the forgery coverage also includes "similar written promises, orders or directions to pay a sum certain in 'money,'" and the provision does not include the word "negotiable." We conclude that this language is broad enough to encompass the fraudulent emails and wire transfer instructions directing Molitor to pay the $220,000 to a specific party in Hong Kong. *See In re Deepwater Horizon*, 470 S.W.3d at 464 (court gives insurance policy's words their ordinary and generally accepted meaning unless the policy indicates the parties intended the language to impart a technical or different meaning).

In sum, evidence admitted at trial showed that an unknown party with intent to deceive used Grunnah's email address and signature block to order or direct Molitor to pay a sum certain in money by wire transfer, a "loss resulting directly from 'forgery'" as defined in the policy. Consequently, we conclude there was evidence to support the jury's answer to Question 4, and the trial court did not err by denying Central's motion to disregard it. We decide Central's fifth issue against it.

## 3. Findings on amount owed for losses (Issues 3 and 4)

Central's third and fourth issues address Questions 6 and 7 of the jury's verdict. In response to Question 6, the jury answered "no," finding that Central did not fail to pay the amount owed for losses under the insurance policy. Question 7, inquiring about damages for Central's failure to pay, was dependent on a "yes" answer to Question 6. The jury followed the instruction and did not answer Question 7. Central argues that the trial court committed reversible error by disregarding the

jury's "no" answer to Question 6 and by failing to render judgment in Central's favor when the jury did not award Reliance any damages in response to Question 7.

"'A trial court may disregard a jury finding only if it is unsupported by evidence . . . or if the issue is immaterial.'" *USAA Tex. Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 505 (Tex. 2018) (quoting *Spencer*, 876 S.W.2d at 157). A jury answer is immaterial when the question should not have been submitted, or when it was properly submitted but has been rendered immaterial by other findings. *Id.* at 506. Further, "[t]he trial court need not submit jury questions on undisputed facts." *European Crossroads' Shopping Ctr., Ltd. v. Criswell*, 910 S.W.2d 45, 56 (Tex. App.—Dallas 1995, writ denied); *see also Menchaca*, 545 S.W.3d at 501 ("A breach-of-contract claim can involve any one or more of numerous discrete issues, but the jury need only be asked and instructed about those the parties actually dispute, and on which the pleadings and evidence actually raise an issue." [internal quotation omitted]).

Central argues that the breach of contract question was properly submitted because of the numerous factual disputes that the jury was asked to resolve, including application of two other crime coverages to the loss. But the trial court's judgment rests on the jury's finding in response to Question 4—that Reliance suffered a loss resulting directly from forgery—establishing Central's liability under the policy despite the jury's resolution of factual disputes in Central's favor on other

coverages. Consequently, even if Question 6 was properly submitted, the answer was rendered immaterial by the jury's affirmative answer to Question 4.

Because we have concluded that Reliance's loss was covered under Central's policy and because both the amount of the loss and Central's failure to pay it are undisputed,[4] we conclude the trial court did not err by disregarding the jury's answer to Question 6 or by rendering judgment for Reliance in the amount of its loss. We decide Central's sixth and seventh issues against it.

**4. Damages for bad faith (Issue 6)**

In its sixth issue, Central argues the trial court erred by failing to disregard the jury's answers to Questions 8 and 9, the common law bad faith questions, and awarding Reliance judgment for the $25,000 found by the jury in response to Question 9.

Central contends that under *Menchaca*, "an insured may not recover any extra-contractual damages if the insured is not entitled to any benefits under the insurance policy." *See Menchaca*, 545 S.W.3d at 490 (stating the "general rule . . . that an insured cannot recover policy benefits for an insurer's statutory violation if the insured does not have a right to those benefits under the policy"). But because we have concluded that the trial court correctly awarded policy benefits to Reliance,

---

[4] Central contends the amount of Reliance's loss was not established as a matter of law because "some of the funds transferred by Molitor belonged to third parties, not Reliance." There was no evidence, however, that the transferred funds were not in Reliance's control or that any party other than Reliance suffered any portion of the loss. In sum, Reliance pleaded and offered proof that it suffered damages of $220,000 as a result of the fraud.

–20–

*Menchaca*'s holding does not preclude recovery of extra-contractual damages in this case.

We also conclude there was evidence to support the jury's "yes" answer to Question 8. In Question 8, the jury was instructed that "[a]n insurer fails to comply with its duty of good faith and fair dealing by":

- Failing to attempt in good faith to effectuate a prompt, fair, and equitable settlement of a claim when the insurer's liability has become reasonably clear
  or
- Refusing to pay a claim without conducting a reasonable investigation of the claim
  or
- Canceling an insurance policy without a reasonable basis.

Reliance offered evidence that Central failed to interview Molitor and Grunnah, did not attempt to learn the scope or result of any law enforcement investigation, based its coverage decision on limited information, and gave Reliance inconsistent information about the basis for its denial. Further, Central did not rely on the Voluntary Parting exclusion as a reason for denying the claim.[5] This is some evidence to support the jury's finding in response to Question 8. *See Tanner v.*

---

[5] Central cites *Republic Insurance Co. v. Stoker*, 903 S.W.2d 338, 341 (Tex. 1995), for the proposition that an insurer is not precluded from defending a claim based on a reason that was not given for denying the claim. In *Stoker*, the court described the dispositive question as "whether, based upon the facts existing at the time of the denial, a reasonable insurer would have denied the claim." *Id.* at 340. Here, in determining the dispositive question under *Stoker*, the jury could consider Central's conduct in denying the claim based on one set of reasons but defending the lawsuit based on a new and different reason. We also note that in *Stoker*, in contrast to this case, the plaintiffs' claims were not covered by the policy. *See id.*

*Nationwide Mut. Fire Ins. Co.*, 289 S.W.3d 828, 830 (Tex. 2009) ("We will uphold a jury's finding if more than a scintilla of competent evidence supports it.").

We agree with Central, however, that Reliance did not offer any evidence to support the jury's $25,000 damage award. "A claim for bad-faith conduct that breaches the common-law duty can potentially result in three types of damages: (1) benefit of the bargain damages for an accompanying breach of contract claim, (2) compensatory damages for the tort of bad faith, and (3) punitive damages for intentional, malicious, fraudulent, or grossly negligent conduct." *Menchaca*, 545 S.W.3d at 488 n.11 (internal quotations and citations omitted).

Citing evidence of "Central's complete lack of investigation, in addition to its everchanging reasons for denying coverage," Reliance offers two possible grounds for the jury's award: (1) "to compensate Reliance for the time and expense it incurred trying to force Central to investigate its claim" and (2) "for the mental anguish Debbie Molitor, Reliance's primary employee, suffered as a result of Central's denial of Reliance's claim without conducting any meaningful investigation." But Reliance did not offer any evidence to support an amount of damages for either of these grounds, and in any event, Molitor is not a plaintiff in this case and did not assert a cause of action against Central for damages. Further, the trial court awarded attorney's fees to Reliance in addition to the jury's award of bad faith damages, compensating Reliance for the time and expense incurred by its attorneys in pursuing its claim at trial and on appeal.

We conclude there is no evidence to support the jury's award of $25,000 in response to Question 9. Consequently, we sustain Central's sixth issue and reverse the portion of the judgment awarding Reliance $25,000 in damages for Central's failure to comply with its duty of good faith and fair dealing.

## CONCLUSION

We reverse the portion of the judgment awarding Reliance $25,000 in damages for Central's failure to comply with its duty of good faith and fair dealing. In all other respects, the trial court's judgment is affirmed.

/Robert D. Burns, III/
ROBERT D. BURNS, III
CHIEF JUSTICE

210071F.P05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

CENTRAL MUTUAL INSURANCE
COMPANY, Appellant

No. 05-21-00071-CV      V.

RELIANCE PROPERTY
MANAGEMENT, INC., Appellee

On Appeal from the 44th Judicial
District Court, Dallas County, Texas
Trial Court Cause No. DC-18-00856.
Opinion delivered by Chief Justice
Burns. Justices Schenck and Partida-
Kipness participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED** in part and **REVERSED** in part. We **REVERSE** the award of $25,000 in damages to appellee Reliance Property Management, Inc. in paragraph 2 of the trial court's judgment. Judgment is **RENDERED** that appellee Reliance Property Management, Inc. take nothing on its claim for breach of the duty of good faith and fair dealing. In all other respects, the trial court's judgment is **AFFIRMED**.

It is **ORDERED** that appellee Reliance Property Management, Inc. recover its costs of this appeal and the amount of the judgment as affirmed from appellant Central Mutual Insurance Company and from the cash deposit in lieu of cost bond. After all costs have been paid, the clerk of the Dallas court is directed to release the balance, if any, of the cash deposit to Central Mutual Insurance Company.

Judgment entered May 25, 2022